# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

CHRISTOPHER LILLY C/O SAMEERA
ALI, ESQ., 1629 K. ST. NW, STE. 300,
WASHINGTON, D.C. 20006,

               Plaintiff,

        v.

District of Columbia

   *Serve*
      Hon. Muriel Bowser
      Mayor of the District of Columbia,
      Executive Office of the Mayor
      1350 Pennsylvania Ave., N.W.
      Suite 310
      Washington, D.C. 20004

      Karl A. Racine
      Attorney General of the District of
      Columbia,
      Office of the Attorney General
      Government of the District of
      Columbia
      One Judiciary Square
      441 4th Street, N.W.
      Suite 106N
      Washington, D.C. 20001

               Defendant.

Civil Action No. _____

## **COMPLAINT**

There is no other civil action between these parties arising out of the same transaction or

occurrence as alleged in this Complaint pending in this Court, nor has any such action been

previously filed and dismissed or transferred after having been assigned to a Judge.

NOW COMES, Plaintiff, Mr. Christopher Lilly ("Mr. Lilly" or "Plaintiff"), by and

through the undersigned counsel, and hereby sues the District of Columbia and the District of

Columbia Metropolitan Police Department ("MPD") for discrimination on the bases of sexual orientation, personal appearance and reprisal for engaging in protected internal MPD EEO activity and EEO activity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 US. § 2000e, *et sec.,* and the District of Columbia Human Rights Act, D.C. Code § 2-1401 and 1402, *et seq.,* and deprivation of civil rights in violation of 42 U.S.C. § 1983.

## Jurisdiction

1. This Court enjoys subject matter jurisdiction over this action under 28 U,S.C. §§ 1331, 1343, and 1367, and 42 U.S. C. § 20000e-5(e)(3).

## Venue

2. Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(b)(1) and (2). Plaintiff was employed in the District of Columbia and Defendant is located in the District of Columbia. The discrimination and reprisal occurred in the District of Columbia during the course of Plaintiff's employment by Defendant in the District of Columbia.

## Parties

3. Plaintiff, Mr. Christopher Lilly, formerly Officer Christopher Lilly, was an Officer in the MPD and correctly resides in Las Vegas. Nevada. Plaintiff Lilly at most times relevant to this Complaint, Plaintiff resided in Alexandria, Virginia and then Bethesda, Maryland. Plaintiff Lilly, a gay man, joined the MPD on February 20, 2007. He was assigned to the 4th District ("4D") in November 2007 and was assigned as an officer.

4. At all times relevant to this suit, Plaintiff Lilly was an "employee" of the Defendant, as defined by 42 U.S.C. § 2000e and § 2-1401.02(9) of the D.C. Human Rights Act.

5. Defendant District of Columbia is a municipal corporation. The District of Columbia acts by and through its primary law enforcement agency, MPD. The Fourth District ("4D") and the Officers, Sergeants and Lieutenants are constituent Divisions of the MPD.

6. The District of Columbia is an employer within the meaning of 42 U.S.C. § 2000e(b) and § 2-1401.02(10) of the D.C. Human Rights Act.

**Factual Basis of the Complaint**

The onset of Plaintiff Christopher Lilly's employment

7. Mr. Christopher Lilly ("Mr. Lilly" or "Plaintiff" or "Plaintiff Lilly") was an officer in the District of Columbia Metropolitan Police Department ("MPD"), was a resident of Washington, D.C. and subsequently Bethesda, Maryland. Mr. Lilly now resides in Las Vegas, Nevada full time.

8. On or about February 20, 2007, Mr. Lilly joined the MPD and was initially in the academy for eight (8) months.

9. On or about November 2007, Mr. Lilly was assigned to the MPD Fourth District ("4D"), Police Service Area ("PSA") 403, as an officer.

10. At the onset of Mr. Lilly's employment, no persons in the MPD were told by Mr. Lilly or were aware of Mr. Lilly's sexual orientation.

11. Prior to joining MPD, Plaintiff Lilly had been previously treated for Obsessive Compulsive Disorder ("OCD") tendencies and has been diagnosed and treated for Attention Deficit Hyperactivity Disorder ("ADHD"), since the age of 20.

12. Since the onset of Plaintiff Lilly's employment, these diagnoses did not interfere or affect Mr. Lilly's job performance.

13. For fiscal years 2007 through 2002, Plaintiff Lilly's annual performance ratings on the MPD's five pint rating system was a three (3).

14. For fiscal years 2009 through 2011, Plaintiff Lilly's annual performance rating increased to a four (4).

15. For five (5) years, Plaintiff Lilly diligently, dutifully served as a patrol office for the MPD, without incident.

Plaintiff Lilly is "outed" and begins to suffer
bias-related/hate crimes due to his sexual orientation

16. On or about December 2010, without Plaintiff Lilly's knowledge or consent, his sexual orientation, homosexual, was publicized, maliciously and intentionally. To Mr. Lilly's knowledge, the persons involved included Officer Lauren Griffin (3D), Officer Robert Barillaro (7D) and a MPD cadet Bobby, last name unknown. Plaintiff Lilly did not reveal this information on his own nor did he have any intention to do so because of his fear of repercussion and retaliation. Plaintiff Lilly was the sole homosexual male in 4D.

17. Following Plaintiff Lilly's "outing," any officer to come into contact with Plaintiff Lilly subjected him to scrutiny, retaliation and ridicule by means of vulgar language, slandering his name and abilities to function as a police officer and questioning his abilities to serve due to his sexual orientation.

18. By January 2011, the ridicule, retaliation and scrutiny of Plaintiff Lilly escalated. After returning from duty, Officer Lilly found his locker plastered with Blair Underwood posters, forty (40) District of Columbia HIV magnets stuck to his locker and a large "spurt" looking puddle of unknown white liquid, meant to simulate ejaculation. Officers around the area snickered and failed to assist Officer Lilly to clean the mess around his locker. No other persons' lockers were vandalized.

19. Following the January 2011 hate crime: despite Plaintiff Lilly apprehensions and fear of retaliation, he filed a report and complaint with Commander Missouri, Detective Mary Bonacorsy and Officer Susan Taylor (2D), the EEEOC contact of the MPD. To Plaintiff Lilly's knowledge, no investigation or follow-up was made into this matter.

20. Due to the lack of response from MPD to the bias-related/hate crimes, Plaintiff Lilly remained on duty, following assignments; keeping his head down to avoid unwanted attention.

21. By late Spring 2011, Plaintiff Lilly's superiors, fellow officers, and new academy graduates took to publicly ridiculing him. Instances of directed cruelty and discrimination were, without prompt, an Office Barnes would yell at Plaintiff Lilly, "What a Fucking Faggot!" Or during a month long alleged sensitivity training about Lesbian, Gay, Bi-Sexual, Transgender/Transsexual, and Queer ("LGBTQ") individuals, Plaintiff Lilly's fellow officers used that "training" to single out and point out fault in Mr. Lilly because he identifies as homosexual, calling him a "faggot." To Plaintiff Lilly's knowledge, no report, investigation or follow-up was made into this matter.

22. At one particular roll call, an Officer Lavigne looked directly at Plaintiff Lilly, amidst the whole precinct, bluntly said, "Well I just know all the faggots will burn in hell…so that is on them." To Plaintiff Lilly's knowledge, no report, investigation or follow-up was made into this matter.

23. On or about June 2011, Plaintiff Lilly was specifically ordered to work riot control at the District of Columbia Pride Parade because of his sexual orientation, despite his protest and discomfort due to lack of training and experience in riot control.  Plaintiff Lilly

reasonably believed this forced assignment was motivated by bias-related to his identified sexual orientation.

Plaintiff Lilly's Develops Stress Related Disability Due to Performance on Duty

24. On or about September 10, 2011, Plaintiff Lilly responded to a call as part of the crisis intervention officer program where he was attacked with a large knife by a mentally disturbed woman who had not bathed in three 3) months. While on duty and as a result of responding to this call, Plaintiff Lilly developed a major insect infestation of his body, home, car and clothing (most of which had to be disposed of in order to re-establish a safe and livable home environment, at a personal cost to Plaintiff Lilly of approximately $7,000.00.  The infestation experienced by Plaintiff Lilly was departmentally ruled as a direct result of Performance of Policy Duty ("POD").

25. Due to this the incidence on September 10, 2011, Plaintiff Lilly was forced to take one (1) month of sick leave.

26. On September 12, 2011, Plaintiff Lilly filed a PD-42[1], by which he indicated there were three incidents that were causing work-related stress, (1) on August 30, 2011, Plaintiff was assaulted by a teenager, (2) on September 9, 2011 a individual, in progress of attempted suicide, cut his arm, and (3) the September 10, 2011 incident.

27. On September 14, 2011, Plaintiff Lilly presented before the MPD's Behavioral Heath Services ("BHS") physician noted that Plaintiff was symptomatic of a psychological illness and placed him on Sick Leave status..

---

[1] A PD-42 is a form submitted by a member of the MPD who has suffered an injury or illness and if the member indicates that the injury or illness occurred as a result of performance of duty the respective Department will investigate it and a decision, which may be appealed, will be rendered.

28. On or about September 19, 2011, BHS diagnosed Plaintiff Lilly with Acute Stress Disorder and Post Traumatic Stress Disorder ("PTSD") as a result of the incident.

29. On or about September 23, 2011 and subsequently on September 30, 2011, the BHS physician diagnosed Plaintiff Lilly with Adjustment Disorder with Anxiety and continued him on Sick Leave status.

30. On or about October 7, 2011, the BHS physician confirmed Plaintiff Lilly was ready to return to 4D, to perform on limited duty status. Plaintiff Lilly filed with the MPD his request and intention to participate in Limited Work Duty.

31. From October 2011 until January 2012, Plaintiff Lilly remained on Limited Work Duty until he recovered from the impending psychological and mental injuries by which he suffered.

The Bias-Related/Hate Crimes Escalate to<br>Encompass Plaintiff Lilly's Sexual Orientation and Disability.

32. On January 13, 2012, Plaintiff Lilly met the BHS physician Dr. Mary Kenel ("Dr. Kenel"), to whom he indicated that he was feeling better. Plaintiff Lilly returned to full duty on January 17, 2012.

33. From January 2012 through August 2012, the scrutiny, ridicule and humiliation of Plaintiff Lilly increased. Not only were Officers, Sergeants and Lieutenants of 4D singling him out due to sexual orientation, but now because of his disability.

34. Specific instances is bias-related/hate crime conduct includes another officer, Officer Ann DeRoo, publically denying the existence of Plaintiff Lilly's PTSD and accompanying disorders, alleging that his disability and reactions were all due to his sexual orientation and his failure to act like any other heterosexual officer.

35. As Plaintiff Lilly return to full time duty, a Lieutenant Posey, within 4D, began taunting Plaintiff Lilly, calling him "bug man" or "bedbugs" or "drama queen." Other officers attempted to provoke Plaintiff Lilly by calling him "crazy," jeering at him with "Oh Shit, the clinic decide you not crazy anymore." The clear reception and intent of the officers, sergeant and lieutenant's comments were to cause Plaintiff Lilly bias-related hate, apprehension and fearfulness of his safety and well being while in 4D. No other person who was at the scene from September 10, 2011 experienced the same ridicule or taunting due to sexual orientation.  No other person suffering from PTSD or Acute Stress Disorder were singled out and/or ridiculed.

36. By August 2012, Plaintiff Lilly, in an effort to avoid the discriminatory hate crimes against him, avoided social interactions with fellow 4D officers. To the best of Plaintiff's knowledge, no actions were taken in effort to relieve the discrimination experienced by Plaintiff Lilly. As a result of said discrimination, Mr. Lilly's stress and mental disabilities continued to worsen.

37. On or about mid-August 2012, Plaintiff Lilly performed in a nightclub, with spray painted spiked hair. When a video surfaced of Plaintiff Lilly's performance, he was reprimanded and disciplined for failure to follow proper police procedures.

38. Plaintiff Lilly's disciplinary action for an outside musical performance was unfounded and without merit and perceived as due to discriminatory intent.

39. Other heterosexual male officers acted in the same manner, performing when off-duty and did not suffer the same consequences. For example, Officer Duane Riley, in 4D, a heterosexual male was paid for musical performances and an Officer Mike Tuwat, in 2D, was a member of a rock band, which played at the annual Police Week.

40. Despite Plaintiff Lilly identifying the clear discrepancies i.e. the disparate and disproportionate treatment and discipline between him and his heterosexual counterparts, to the reprimanding Commander, Plaintiff Lilly was still disciplined and his counterparts, Officer Riley and Officer Tuwat were not.

Plaintiff Lilly's Disability Worsens And Thus The Disparaging Treatment Increases

41. On or about September 27, 2012, Plaintiff Lilly responded to call, a possible kidnapping. On the scene, a teenage girl, a juvenile runaway, was apprehended. On the scene, Plaintiff Lilly investigated the scene, per protocol, but he was alone, without a partner. Once vacating the property, Plaintiff Lilly came to learn that all other officers and sergeants on the scene remained outside the crime scene because they believed it to be invested with bed bugs.

42. On the scene, an Officer Justin Lyons and the other officers on the scene proceeded to mock Plaintiff Lilly.  The officers and sergeants on the scene, laughed, acknowledging their failure to inform Plaintiff Lilly of the suspected bedbugs at the scene and indicating his life choices and disability were comical.

43. In spite of the officers and sergeant's prior knowledge of Plaintiff Lilly's PTSD, Plaintiff Lilly was ordered to transport from the scene to 4D, the teenage girl found on the scene, who was infected with bedbugs.

44. It was clear from this incident, Plaintiff was becoming more a target within 4D, being placed in situations which exacerbated his disability, PTSD, and using his sexual orientation as a means to single him out and place him in dangerous situations by which other heterosexual officers were not subjected to.

45. Subsequently, on September 27, 2012, as a consequence, Plaintiff Lilly's PTSD re-surfaced. In a visit to Washington Hospital Center, an Officer Tobe, alleged that Plaintiff's Lilly was acting "erratic " and that the on-call nurses felt uncomfortable around Mr. Lilly.

46. Due to the prolonged exposure to bedbugs, from the POD on September 27, 2015, and his past experience with a bedbug infestation, Plaintiff Lilly went to Washington Hospital Center for an exam. After waiting, the physicians' failure to treat and examine Mr. Lilly required him to take taxi to the MPD Police and Fire Clinic.

47. By October 2, 2012, Plaintiff Lilly was reprimanded and disciplined by Lieutenant Shane B. Lamond, Commander of Police Service Area, PSA 403, due to an alleged violation of MPD General Order (Uniforms and Equipment), for having a Mohawk and not being "clean-shaven." Plaintiff Lilly's personal appearance, however, was not abnormal.

48. Plaintiff Lilly voiced his perception and understand of this disciplinary action to be discriminatory in nature. Another officer, Officer Medger Webster often wore Mohawk(s) and appeared not "clean-shaven" while on duty and suffered no consequence or discipline. Officer Webster, in contrast to Plaintiff Lilly, is a heterosexual male.

49. On or about October 5, 2012, Officer Lilly received a letter of reprimand and then was subsequently coerced into signed the letter of reprimand with threats of further disciplinary procedures.

50. By October 13, 2012, Plaintiff Lilly received an overall Officer Performance Rating of one (1), which indicates that he was seen as not meeting any expectations as an Officer. A drastic change from any previous evaluations and he was forced to stand for a fitness

for duty assessment, based on unfounded accusations of failing to follow proper police

procedures. Plaintiff Lilly appealed this decision.

51. By November 2012, due to the second prolonged exposure to bedbugs and the

subsequent discriminatory disciplinary action, Plaintiff's Lilly's PTSD required bi-

weekly check-ups, costing $2,300.00 out of pocket. An expense Plaintiff Lilly would

never had to incur, if it were not for the MPD's actions i.e. discriminatory and

derogatory treatment due to sexual orientation and disability and failure to providing

adequate accommodation.

52. On or about November 3, 2012, despite MPD, 4D's knowledge of Plaintiff Lilly's

PTSD/ADHD diagnoses and required accommodation to complete reports, Plaintiff Lilly

received notice that due to failure to turn in police reports on time, he was being issued a

notice of tardiness and was docked two (2) hours of leave. Plaintiff Lilly turned in his

report in three (3) hours instead of two (2), yet he was reprimanded to the harshest

extent. Other heterosexual officers in 4D, however, often turned in their reports late and

did not receive the same reprimand.

53. By late December 2012, Plaintiff Lilly received notice a of proposed action for the

August 2012 off-duty musical performance, by which he would be suspended for ten

(10) days without pay in the near future.

54. By the end of 2012, Plaintiff Lilly had been verbally tortured and ridiculed due to his

sexual orientation and disability. In a increasingly hostile environment, he had been

treated different than his heterosexual colleagues, placed in significantly dangerous

situations in comparison to his colleges, denied reasonable accommodation in his

employment i.e. placing him in a bed-bug invested crime scene exacerbating his

condition, and reprimanded for the same activities and personal appearances that his

heterosexual counterparts were not disciplined for. Plaintiff Lilly was being placed at a

disadvantage and this treatment occurred with only filed complaint that to his knowledge

was not investigated.

**Plaintiff Lilly Files Formal Complaint(s) of Discrimination to MPD,
Only to Incur a Harsher Wrath**

55. By January 8, 2013, Plaintiff Lilly obtained counsel by and through Mr. Jason

    Ehrenburg ("Mr. Ehrenburg"), who began correspondence with MPD, indicating that the

    disparate treatment received by Plaintiff Lilly i.e. the excessive disciplinary action, the

    discriminatory harassment due to Mr. Lilly's sexual orientation, disability, and now

    personal appearance was hostile, discriminatory and demanded resolution. Plaintiff

    Lilly, by and through Mr. Ehrenburg did not receive a meaningful response.

56. On or about January 13, 2013, due to the ongoing discrimination and increased hostility

    in the workplace, Plaintiff Lilly reported each incident, from January 2011 on, to Officer

    Carlos Meijia ("Officer Meijia").

57. In Plaintiff's Lilly's correspondence with Officer Meijia, he requested a transfer and a

    demand for an investigation and resolution of these crimes. Plaintiff Lilly indicated that

    homosexual male in 5D experienced similar hate crimes and was provided the

    opportunity to immediately transfer. The same luxury was not provided to Mr. Lilly. To

    Plaintiff Lilly's knowledge his claims were not investigated.

58. On or about January 22, 2013, a week after Plaintiff Lilly filed the formal charges of

    discrimination, he received notice, from the MPD's Assistant Chief, Professional

    Development Bureau, that he was being placed on chargeable sick leave status without

    pay. The stated rationale for this action was that on September 28, 2012, Mr. Lilly was

12

allegedly placed on Limited Duty and Mr. Lilly had not, to date requested approval to continue to work limited duty beyond the period previously granted to him. After contest by Mr. Ehrenburg, the officials at MPD rescinded the threatened action of sick leave without pay.

59. On or about March 7, 2013, Plaintiff Lilly received notification that his application to work on a limited duty status was denied and effective March 24, 2014, he would be placed on chargeable sick leave status without pay.

60. On or about March 15, 2013, however, Plaintiff Lilly was detailed from Paroled Services and School Security Bureau, 4th District to the Investigative Services Bureau, Youth Investigations Division (pursuant to LDP #12-04). Moved outside of this existing precinct.

61. On or about March 25, 2013, Plaintiff Lilly's treating physician Dr. Lyerly Walker, M.D. indicated to BHS physicians that with regular psychotherapy and medication management consultations, Plaintiff Lilly would make a full recovery, returning to full duty status as a Police Officer within six (6) to nine (9) months. Without the stress of bias-related/hate crimes and upon limited duty, Plaintiff Lilly was likely to return to work.

62. On or about April 4, 2013, in regards to the poor performance-rating Plaintiff received on October 13, 2012, Plaintiff Lilly received notice that after reevaluation, the Performance Rating Appeal Panel ("Panel") reevaluated Plaintiff's Overall Rating and changed it from "Does No Meet Expectations" to "Meets Expectations." Plaintiff perceived that the previous rating received was not based on any merit and was given due to the discriminatory actions of the supervisor in 4D.

63. On or about April 9, 2013, after receiving the renewed Performance Rating, Plaintiff
    Lilly, experienced another bought of discrimination, in which fellow officers, sergeants
    and lieutenants began making derogatory, discriminatory and disparaging jokes about
    Plaintiff Lilly's homosexuality and personal appearance. So disturbed, Plaintiff Lilly,
    had to leave the room, immediately reporting this event to Detective Mary Bonacorsy
    and Officer Mejia. To Plaintiff's knowledge this discrimination event, while noted, was
    not investigated.

64. Subsequently on April 9, 2013, Plaintiff Lilly received notification that the MPD did not
    find that his re-triggered PTSD was caused by the September 27, 2012 bedbug call. On
    April 11, 2013, Mr. Lilly's counsel filed an appeal of the non-performance of duty
    classification by the Direction of Medical Services Branch of the PD 42 (Illness/Injury
    Report).

65. On or about April 16, 2013, Plaintiff Lilly became the target of an unwarranted
    investigation by MPD. MPD's Internal Affairs Division, delivered a letter to Mr. Lilly's
    home, where he was informed that he was the target of an investigation and he was
    forced to sit for an interview for IAD agent Lashon Jones-Warren.

66. On or about April 17, 2013, Plaintiff Lilly experienced yet again another bias-
    related/hate crime, while on detail at the Youth Services Division, by which several
    MPD employees and officials, including a Sergeant Zarowski, began coming of a supply
    closet skipping, saying, "I'm a free little fair faggot queer," all which pointing and
    laughing at Plaintiff Lilly.

67. Following this incident April 17, 2013, Plaintiff Lilly filed a formal complaint with all

relevant MPD officials, including Sergeant Crystal Bernard. To the best of Plaintiff

Lilly's knowledge this incident was not investigated.

68. On or about April 18, 2013, in response to Plaintiff Lilly's complaint, he was placed on

sick leave without pay for indeterminate amount of time.

**Follow Plaintiff Lilly's Report of Discrimination, He Continued To be Disciplined and**
**Subsequently Recommended for Retirement In Lieu of**
**MPD Investigating His Report Hate Crimes**

69. By April 19, 2013, Plaintiff Lilly, following his numerous reports of discrimination with

4D, received a Notice of Adverse Action, by which he was recommended for disability

retirement.

70. On or about April 24, 2013 Mr. Lilly, by and through his counsel Mr. Ehrenburg, filed a

formal notice with MPD, pursuant to D.C. Code section 12-309 of his intention to file a

claim for damages against the District of Columbia and the Metropolitan Police

Department. This correspondence was written to follow-up the correspondence sent in

January 2013.

71. On or about May 3, 2013, Mr. Lilly's detail in the Investigative Services Bureau, Youth

Investigations Division ended, and Mr. Lilly was returned back to Patrol Services and

School Security Bureau, 4D.

72. On or about May 7, 2013, Plaintiff Lilly was provided a Limited Duty Certification form

in which he was approved to work full time, 6 hours a day, beginning on May 8, 2013.

This limited duty included deskwork only and no outside patrol.

73. On or about May 8, 2013, Plaintiff Lilly's treating psychiatrist indicated to MPD that

Mr. Lilly still suffered from PTSD and this condition only worsened if the stress level

was too high. Furthermore, the medications by which Mr. Lilly was prescribed caused

reactions not within his control i.e. hyper insomnia.  MPD was on notice that Officer

Lilly required accommodation, even with Limited Duty.

74. On or about May 9, 2013, Plaintiff Lilly was served a notice of Proposed Adverse

Action to terminate his employment due to violation of General Order Series 120.21,

"Absent without Leave," to which Mr. Lilly responded on May 14, 2015, requesting an

Adverse Action Hearing. Mr. Lilly, while understanding his failure to appear for work

was a violation, failure to acknowledge the disability that caused his failure to appear for

work was discriminatory in nature.

75. On or about May 11, 2013, Plaintiff Lilly received a Performance rating warning notice

for the period of 10/1/2012 to 9/30/2013 of a "below average" rating based on "work

habits." Yet the report indicated that while Plaintiff Lilly was at the Youth Services,

there were no incidents or issues with his performance. The division within MPD that

appeared to have issues with Plaintiff Lilly's performance was those in 4D.

76. On or about May 16, 2013, Plaintiff Lilly received a Limited Duty Certification Form in

which he could work full hours and full days by desk-work only and not outside patrol.

Full hours and full days per week, which was approved by Dr. Mary Kenel and Sergeant

Smith.

77. Following the recommendation to return to work, however, the discriminatory verbal

tortured and ridicule due to Plaintiff's Lilly's sexual orientation and disability continued.

His environment remained hostile, as though his colleagues were well aware of his

reports of their discrimination. Name calling such as "faggot," "drama queen," and

"bedbug 2.0," "fairy" continued without consequence or resolution. As a result of this

withering discriminatory treatment Plaintiff's stress increased, believing the hate related treatment would result in the continued threat of his termination.

78. Over the course of June 2013 through July 2013, Plaintiff Lilly, due to stress caused by MPD's discriminatory actions i.e. unparalleled treatment of heterosexual males versus the homosexual male, in the field, unequal treatment through disciplinary actions and discriminatory abuse by his colleagues, was admitted into Dominion Hospital.

79. By July 18, 2013, a disability retirement proceeding took place before the Police and Firefighters' Retirement and Relief Board to determine if Plaintiff Lilly should be retired on disability. Plaintiff Lilly argued that if it were not for the hate crimes experienced, the discriminatory actions in work placement and assignments and the bias-related incidents caused by his colleagues in 4D, his stress would not have increased and he would be able to return to full duty as a police officer.

80. On August 9, 2013, an interim order was issued by which Plaintiff Lilly was granted retirement based on disability incurred in the performance of duty after more than five (5) years and would receive 40% of his basic salary as compensation.

81. On December 5, 2013, a final order was issued where Plaintiff Lilly was found to be retired by reason of disability incurred in the performance of duty after more than five (5) years and would receive 40% of his basic salary as compensation.

Damages Incurred

82. As a result of MPD's termination, Plaintiff Lilly's income severely reduced. Plaintiff's Lilly was never paid back in full for doctor's bills, paid for forced medical leave and his pension was frozen.

83. With the reduced income, Plaintiff Lilly was evicted from his home, resulting in homelessness' and subsequent addiction.

84. As a consequence of the discrimination and subsequent retaliatory action(s) for filing formal complaints about the discrimination experienced with 4D, Mr. Lilly continues to suffer with a mental breakdown and suffers with

85. And since Mr. Lilly's wrongful termination, he has had difficulty securing replacement employment, a problem only exacerbated by his damaged credit.

<u>Exhaustion of Administrative Remedies</u>

86. Plaintiff has exhausted the necessary administrative remedies relating to the instant claims.

87. Beginning on January 2011 until April 2013, Plaintiff filed police reports documenting his complaints of an ongoing hostile work environment due to his sexual orientation, as well as sexual orientation harassment and disability discrimination.  Those reports detailed the harassment, injuries related to the hate-crimes, and damages.

88. In January 2013, Plaintiff filed complaints of discrimination based on sexual orientation and disability with MPD's EEO Compliance Division.

89. In March 2013, MPD made a decision not to investigate Plaintiffs' internal EEO complaints.

90. On or about February 12, 2015, a Dismissal and Notice of Right to Sue ("Notice of Right to Sue") in relation to Mr. Lilly's allegations that (1) MPD discriminated against Mr. Lilly on the basis of his disability, sexual orientation and personal appearance by terminating his employment and (2) retaliating against Mr. Lilly for filing charges of discrimination against MPD to their internal affairs office, was mailed to the following

address 8900 Burdette Rd., Bethesda, Maryland 20817, Mr. Lilly's parent's address. *See attached Exhibit A.*

91. The Notice of Right to Sue Letter was forwarded to the following address 2860 S. Ocean Boulevard, Apt. 407, Palm Beach, Florida 33480, which is where Mr. Lilly's parent's reside during the winter months.

92. Mrs. Kathryn M. Lilly, the Plaintiff's mother received the Notice of Right to Sue via U.S. Postal Mail on March 23, 2015, beginning the ninety (90) day timeline for which to file suit. *See attached Exhibit B.*

93. Mr. Lilly subsequently received the Notice of Right Sue on April 12, 2015. *See attached Exhibit C.*

### Count One

(42 U.S.C. § 1983- Violations of Civil Rights- First Amendment - Reprisal)

94. Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs 7 through paragraph 93 as if fully stated herein;

95. Plaintiff is a homosexual male who engaged in protected EEO activity when he repeatedly reported illegal harassment, hate-crimes, bias-related disciplinary actions and retaliation to his supervisors in the Fourth District.

96. Plaintiff has a firmly established right to be free from reprisal, and an established constitutional right to freedom of expression pursuant to the U.S. Constitution and the Bill of Rights, specifically the First Amendment.

97. Defendants' actions as alleged above deprived Plaintiff of his First Amendment right to freedom of speech by retaliating against him in response to his protected EEO activity.

98. Defendants illegally and in deprivation of those rights subjected Plaintiff to verbal abuse, negative performance evaluations, unfair disciplinary actions, and disparate detail and shift assignments, and denied limited duty and assignment requests and other work benefits in response to Plaintiff's reports of illegal harassment, hate-crimes, bias-related disciplinary actions.

99. During the relevant period, Defendant, through its police department, Chief of Police, and agents thereof, was acting under color of law, specifically under color of the statutes, ordinances, regulations, customs and usages of the District of Columbia.

100. Defendant has by past practice and custom established a policy of retaliating against employees who exercise their right to report a hostile work environment and discrimination.

101. In particular, Defendants knowingly failed to act in accordance with the Department's own Special Order, SO-11-22, on bias-related/hate crimes in the workplace, and knowingly and intentionally acted in retaliation against Plaintiff in violation of the laws of the District of Columbia, which prohibit reprisal against District employees who engage in protected EEO activity.

102. As a direct and proximate result of the Defendant's deliberate discrimination against the plaintiff, he continues to suffer from severe and irreparable injury, mental anguish, embarrassment and humiliation. Plaintiff has also suffered damage to his credit as a result of financial stresses caused by the hostile work environment, disability, and discrimination.

### Count Two

(42 U.S.C. § 1983- Violations of Civil Rights- Fifth Amendment - Due Process)

103.  Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs 7 through paragraph 93 as if fully stated herein;

104.  Plaintiff has firmly established rights under the Fifth Amendment to due process of law. The District of Columbia is a political entity created by the federal government, and thus it is subject to the Fifth Amendment of the United States Constitution.

105.  Defendant's actions as alleged above deprived Plaintiff of his Fifth Amendment rights to due process by denying Plaintiff basic rights to file grievances of his negative performance evaluations and unfair disciplinary actions of Defendant, by failing to provide Plaintiff with minimum due process of the disciplinary charges against him, and by failing to investigate his experienced illegal harassment, hate-crimes, bias-related disciplinary actions in accordance with Department policy.

106.  During the relevant period, Defendant, through its police department, Chief of Police, and agents thereof, was acting under color of law, specifically under color of the statutes, ordinances, regulations, customs and usages of the District of Columbia.

107.  Defendant has by past practice and custom established a policy of violating employees' due process rights with regard to employee discipline, grievances, and internal EEO investigations.

108.  In particular, Defendants knowingly failed to act in accordance with the Department's own Special Orders, SO-11-22, on the procedures and processes for employee discipline and grievance rights for bias-related/hate crimes.

109.  Defendants unfairly and discriminatorily disciplined Plaintiff while failing to follow standard Department procedures and General Orders regarding the investigation of internal charges of misconduct; and Defendant failed to properly investigate Plaintiff's

internal reports of illegal harassment, hate-crimes, bias-related disciplinary action in violation of Department procedures regarding the reporting and investigation of discrimination complaints.

110. As a direct and proximate result of the Defendant's deliberate discrimination against the plaintiff, he continues to suffer from severe and irreparable injury, mental anguish, embarrassment and humiliation. Plaintiff has also suffered damage to his credit as a result of financial stresses caused by the hostile work environment, disability, and discrimination.

## **Count Three**

(DCHRA Sexual Orientation- Hostile Work Environment and Harassment)

111. Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs 7 through paragraph 93 as if fully stated herein;

112. Defendant's conduct as alleged herein constitutes sexual orientation discrimination in violation of D.C. Human Rights Act, §§ 2-1401 and 1402, *et seq.*

113. Defendant created and perpetuated a hostile work environment for Plaintiff wholly and/or partially based upon his sexual orientation, and refused to remedy that hostile work environment even when it was directly and repeatedly reported by the Plaintiff to Defendant.

114. The hostile work environment involved acts by Plaintiff's supervisors and fellow officers.

115. The hostile acts by the supervisors culminated in tangible employment actions, verbal abuse, negative performance evaluations, unfair disciplinary actions, and disparate detail

and shift assignments, and denied limited duty and assignment requests and other work benefits.

116. Defendants unlawfully and seriously harassed Plaintiff on the basis of his sexual orientation.

117. The harassment was so objectively offensive, severe and pervasive that it altered the conditions of Plaintiff's employment and exacerbated Plaintiff's medical conditions.

118. As a direct and proximate result of the Defendant's deliberate discrimination against the plaintiff, he continues to suffer from severe and irreparable injury, mental anguish, embarrassment and humiliation. Plaintiff has also suffered damage to his credit as a result of financial stresses caused by the hostile work environment, disability, and discrimination.

## Count Four

(DCHRA Sexual Orientation- Disparate Treatment)

119. Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs 7 through paragraph 93 as if fully stated herein;

120. Defendant's conduct as alleged herein constitutes sexual orientation discrimination in violation of D.C. Human Rights Act, §§ 2-1401 and 1402, *et seq.*

121. Defendant discriminated against Plaintiff Lilly wholly and/or partially based upon his sexual orientation when it gave him poor performance evaluations, disparate assignments and details, disciplinary actions that made him likely eligible for termination.

122. By intentionally providing Plaintiff Lilly with a lower performance rating than his actual performance merited, Defendant intentionally acted to deprive Plaintiff Lilly of his rightful promotional opportunities.

123. Defendant had no legitimate reason for providing negative evaluations.  The true reason for the failure to provide Plaintiff Lilly with promotional opportunities was due to discrimination on the basis of sexual orientation.

124. As a direct and proximate result of the Defendant's deliberate discrimination against the plaintiff, he continues to suffer from severe and irreparable injury, mental anguish, embarrassment and humiliation. Plaintiff has also suffered damage to his credit as a result of financial stresses caused by the hostile work environment, disability, and discrimination.

### Count Five

(DCHRA- Retaliation- Hostile Work Environment and Harassment)

125. Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs 7 through paragraph 93 as if fully stated herein;

126. Defendant's conduct as alleged herein constitutes retaliation for prior protected activity in violation of D.C. Human Rights Act, §§ 2-1401 and 1402, *et seq.*

127. After Plaintiff reported the illegal harassment, hate-crimes, bias-related disciplinary action on various dates beginning in January 2011, engaging in protected activity under the D.C. Human Rights Act, Defendant retaliated against him in the terms and conditions of his employment.

128. Defendant also retaliated against Plaintiff after he reported the discrimination, beginning in January 2011, by subjecting him to a continuous hostile working environment and harassing him.

129.   The retaliatory harassment and hostile work environment included, but was not limited
to, disparate assignments and details, disciplinary actions, negative performance
evaluations, pay loss, non-promotion, and denial of grievance and due process rights.

130.   As a direct and proximate result of the Defendant's deliberate discrimination against the
plaintiff, he continues to suffer from severe and irreparable injury, mental anguish,
embarrassment and humiliation. Plaintiff has also suffered damage to his credit as a
result of financial stresses caused by the hostile work environment, disability, and
discrimination.

## Count Six

(Title VII- Reprisal- Hostile Work Environment and Harassment)

131.   Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs
7 through paragraph 93 as if fully stated herein;

132.   Defendant's conduct as alleged herein constitutes reprisal for protected EEO activity in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-3(a) and
2000e-16, as amended.

133.   After Plaintiff reported the illegal discriminatory harassment, hate-crimes and bias-
related disciplinary action on various dates beginning in January 2011, engaging in
protected activity under the D.C. Human Rights Act and Title VII, Defendant retaliated
against him in the terms and conditions of his employment.

134.   Defendant also retaliated against Plaintiff after he reported illegal discriminatory
harassment, hate-crimes and bias-related disciplinary action, beginning in January 2011,
by subjecting him to a hostile working environment and harassing him.

135. The retaliatory harassment and hostile work environment included, but was not limited to, verbal abuse, negative performance evaluations, unfair disciplinary actions, and disparate detail and shift assignments, and denied limited duty and assignment requests and other work benefits**.**

136. As a direct and proximate result of the Defendant's deliberate discrimination against the plaintiff, he continues to suffer from severe and irreparable injury, mental anguish, embarrassment and humiliation. Plaintiff has also suffered damage to his credit as a result of financial stresses caused by the hostile work environment, disability, and discrimination.

### Relief Requested

Plaintiffs request that the Court grant the following relief:

a) Judgment against Defendants on all counts;

b) Order Defendant to take remedial action in accordance with Section 19 (b) of Mayor's Order 75-230; § 2-1403.13 and § 2-1403.16 of the Human Rights Act; and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e-5 and 2000e-16, and 42 U.S.C.§1981a.

c) Award compensatory damages, in an amount to be determined by the jury, sufficient to compensate for the pecuniary and non-pecuniary injuries Plaintiffs have suffered, such as but not limited to emotional distress and pain and suffering (Maximum compensatory damages to which Plaintiff is entitled after proof at trial up to the maximum of three hundred thousand ($300,000.00));

d) Impose civil penalties upon Defendant pursuant to § 2-1403.13(a)(1)(E-1);

e) Order defendants to pay plaintiff attorney's fees and costs incurred in this action and in the antecedent administrative proceedings;

f) Impose civil and punitive penalties and attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C. §§ 1981a(a)(1); and

g) Such other legal and equitable relief as the Court deems just and proper in the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable as such.

Respectfully submitted,

CHRISTOPHER LILLY
By Counsel

*/s/ Sameera Ali*_____
Sameera Ali, Esq.
USDC-DC Bar No.: VA86734
Ali, White & Coleman, PLLC.
1629 K. St. NW, Ste. 300
Washington, D.C. 20006
Sameera.awclawfirm@gmail.com
(202) 630-6751
*Attorney for Plaintiff*