**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CHRISTOPHER LILLY, |
|        Plaintiff, |
| v. |
| DISTRICT OF COLUMBIA, |
|        Defendant. |

Civil Action No. 15-738 (EGS)

<u>**MEMORANDUM OPINION**</u>

**I.  Introduction**

Plaintiff Christopher Lilly ("Mr. Lilly") brings this action against Defendant District of Columbia ("the District") for events arising from his employment with the District of Columbia Metropolitan Police Department ("MPD"). He alleges that MPD discriminated against him because of his gender and sexual orientation, created a hostile work environment, and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, *et seq*. Pending before the Court is the District's Motion for Summary Judgment. *See* Def.'s Mot., ECF No. 45. Upon careful consideration of the pending motion, the opposition, the reply thereto, the applicable law, and the entire record therein, the Court **GRANTS** the District's Motion for Summary Judgment.

1

## II.   Background

### A. Factual Background

Except where indicated, the following facts are not in dispute. Mr. Lilly, who identifies as gay, Am. Compl., ECF No. 9 at 3 ¶ 16;[1] was an MPD police officer from February 20, 2007 to August 16, 2013, Def.'s Reply to Pl.'s Counter Statement of Disputed Facts ("Def.'s SOF Reply"),[2] ECF No. 54-1 at 1 ¶¶ 1-2; Def.'s Exs. A & B, ECF No. 45-3 at 2, 4. In November 2007, Mr. Lilly was assigned to the MPD Fourth District ("4D") as a patrol officer. Am. Compl., ECF No. 9 at 3 ¶ 9. He served most of his career with MPD 4D, except for some limited duty assignments to other divisions of MPD. *See* Def.'s Exs. L, Q, & Z, ECF No. 45-3 at 207, 248, 284, 287. On August 9, 2013, the Police and Firefighters' Retirement and Relief Board ("PFRRB") ordered Mr. Lilly's retirement, determining that he was incapacitated from further duty by reason of a disability incurred in the performance of duty, and his retirement took effect on August 16, 2013. *See* Def.'s Exs. W & X, ECF No. 45-3 at 271, 275.

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document, with the exception of deposition testimony, which is to the page number of the deposition transcript.
[2] This filing encompasses the District's Statement of Material Facts Not in Dispute, ECF No. 45-1, and Mr. Lilly's Counter Statement of Disputed Facts, ECF No. 48-2. The Court relies on the District's SOF Reply, ECF No. 54-1, to assist with setting forth the undisputed facts of this case.

### 1. Beginning of Mr. Lilly's MPD Employment Issues

According to Mr. Lilly, no one at MPD knew that he identified as gay until December 2010, when he learned that his sexual orientation was being discussed among the other officers after he was seen leaving a gay nightclub. Am. Compl., ECF No. 9 at 3-4 ¶¶ 10, 16; Pl.'s Opp'n, ECF No. 48-1 at 6-7. Mr. Lilly claims that another officer called him a "fucking homo" and "pretty gay," and that following his "outing," he experienced name-calling and derogatory comments from MPD officers. Pl.'s Opp'n, ECF No. 48-1 at 6-7; Def.'s Mot., ECF No. 45 at 4; Def.'s Ex. C, ECF No. 45-3 at 143:13-21. For instance, Mr. Lilly claims he was called a "sleazeball," a "fucking faggot," and "feminine nickname(s)" such as "Brit-he Spears," "Lilliana," and "Officer Lillita" by other officers "on a daily basis." Pl.'s Opp'n, ECF No. 48-1 at 7; Def.'s Mot., ECF No. 45 at 4; Def.'s Ex. C, ECF No. 45-3 at 126:4-9, 146:5-15, 349:14-22, 350:3-351:18.

In January 2011, Mr. Lilly claims he found his locker covered in HIV/AIDS awareness magnets, along with the word "fag" written in Sharpie on the locker and a white liquid on the floor simulating semen. Def.'s Ex. C, ECF No. 45-3 at 171:14-19, 176:1-21. Mr. Lilly alleges that he attempted to report the incident via phone, id. at 158:15-18; but he did not notify an MPD supervisor, Sergeant Audra Smith, until October 29, 2012, see Pl.'s Exs. D & E, ECF No. 48-3 at 178, 180; Def.'s SOF

3

Reply, ECF No. 54-1 at 8 ¶ 50. MPD was officially made aware of the incident on December 28, 2012. Pl.'s Ex. D, ECF No. 48-3 at 178. On January 13, 2013, Mr. Lilly emailed Sergeant Carlos Mejia of MPD's Gay and Lesbian Unit to follow up on his report, *see* Def.'s Ex. H, ECF No. 45-3 at 122-24; who raised the allegations to MPD's Equal Employment Opportunity ("EEO") Compliance Branch, which opened an investigation, *see* Def.'s Mot., ECF No. 45 at 6. On May 23, 2013, the MPD EEO Compliance Branch issued its report concerning the locker incident, concluding that the events "[did] not meet the threshold of discrimination based on sexual orientation." Def.'s Ex. I, ECF No. 45-3 at 126, 130.

In addition to the locker incident, Mr. Lilly alleges that in 2011 during an LGBTQ training, he was "singled out" and called a "faggot." Def.'s Ex. C, ECF No. 45-3 at 246:3-22. During one roll call, Mr. Lilly alleges that one officer looked at him and said, "All I know is that's on them and faggots burn in hell[.]" *Id.* at 246:15-22.

Mr. Lilly also claims that he was sexually harassed by Officers Maurice Clifford and Scott Pinto, who "constantly" sent him pictures of their genitalia and explicit text messages. *Id.* at 149:9-20, 150:7-13, 152:2-4, 153:9-11. He alleges that once when he was alone with these officers in the 4D gym, they pinned him against the wall, and on other occasions, they "grabb[ed

4

his] ass at work," engaged in thigh and shoulder rubbing, and Officer Pinto once exposed himself to Mr. Lilly in the locker room. *Id.* at 152:8-18, 316:2-22, 317:5-9, 317:20-318:3. In late 2012, Mr. Lilly claims he reported these officers, but no action was taken. *Id.* at 314:6-8, 317:1-4; Pl.'s Ex. B, ECF No. 48-3 at 312:22-313:3, 314:6-315:6. *But see* Def.'s Mot., ECF No. 45 at 5 (contesting Mr. Lilly's claim that he reported the alleged harassment); Def.'s SOF Reply, ECF No. 54-1 at 2 ¶ 4.

### 2. Mr. Lilly's On-Duty Incidents and Affected Performance as an MPD Officer

On September 10, 2011, while on duty, Mr. Lilly responded to a call during which he was "attacked with a large knife by a mentally disturbed woman who had not bathed in" three months. Am. Compl., ECF No. 9 at 5 ¶ 24; Pl.'s Opp'n, ECF No. 48-1 at 8-9. As a result, Mr. Lilly developed a mites/scabies infestation that affected his body, home, and belongings. Pl.'s Opp'n, ECF No. 48-1 at 9; Def.'s Ex. D, ECF No. 45-3 at 70. He was placed on sick leave by a physician from MPD's Police and Fire Clinic ("PFC") on September 14, 2011, who provided a written diagnostic impression that Mr. Lilly was suffering from Acute Stress Disorder and Adjustment Disorder with Anxiety. Pl.'s Ex. C, ECF No. 48-3 at 176. Mr. Lilly remained on sick leave until he was cleared to return to work via limited duty status. *See id.* at 169-70. Mr. Lilly completed a limited duty assignment in the

Court Liaison Division of the Internal Affairs Bureau ("IAB")
from October 23, 2011 to January 29, 2012, when he returned to
4D patrol following approval by his PFC physician. Def.'s Ex. Z,
ECF No. 45-3 at 284, 287; Am. Compl., ECF No. 9 at 7 ¶ 32.

"From January 2012 through August 2012," Mr. Lilly alleges
that his return to MPD 4D was met with increased "scrutiny,
ridicule, and humiliation" by his fellow officers. Pl.'s Opp'n,
ECF No. 48-1 at 10; Am. Compl., ECF No. 9 at 7 ¶ 33. He claims
that he was called "bug man," "bedbugs," "drama queen," and
"crazy," and that one officer blamed his reaction to the
September 2011 incident on his sexual orientation. Pl.'s Opp'n,
ECF No. 48-1 at 10; Am. Compl., ECF No. 9 at 7 ¶¶ 34-35. Then,
on August 16, 2012, Mr. Lilly was involved in an on-duty
incident that led an assailant to evade police capture. *See*
Def.'s Ex. U, ECF No. 45-3 at 264-66. He was charged with
Neglect of Duty and Failure to Obey, and on March 18, 2013, he
received a fifteen-day suspension for this charge.[3] *Id.* at 264.
Mr. Lilly appealed this suspension, but the Chief of Police
denied his appeal on April 8, 2013, finding that his conduct
"was an embarrassment to the Department and to [him] as a law
enforcement officer." *Id.* at 264-65. However, given his work

---

[3] Mr. Lilly was also reprimanded for neglect of duty in a prior
incident on July 24, 2012. Def.'s Ex. K, ECF No. 45-3 at 202.

history and lack of a disciplinary record, five of the suspension days were held in abeyance for one year. *Id.* at 266.

On September 27, 2012, Mr. Lilly responded to a possible kidnapping and was exposed to bedbugs at the scene. Def.'s Ex. E, ECF No. 45-3 at 77; Def.'s SOF Reply, ECF No. 54-1 at 2 ¶ 7. Mr. Lilly claims that he was ordered to go inside, while the other officers remained outside. *See* Def.'s Ex. E, ECF No. 45-3 at 79; Pl.'s Ex. B, ECF No. 48-3 at 282:1-22. Despite his prior history with bedbugs, he was ordered to transport an infected girl from the scene to the hospital. Def.'s Ex. E, ECF No. 45-3 at 80. Because of this incident, Mr. Lilly's mental health conditions were exacerbated. *See id.* at 82; Pl.'s Ex. C, ECF No. 48-3 at 141-42. As a result, on September 28, 2012, Mr. Lilly was placed on limited duty status for the second time, and his police powers were revoked the next day. *See* Def.'s Ex. F, ECF No. 45-3 at 88; Def.'s Ex. G, ECF No. 45-3 at 107 (detailing MPD's policy for revoking an officer's police powers due to a medical condition); Def.'s SOF Reply, ECF No. 54-1 at 2 ¶ 9. He also reported two hours late for work that day and was placed in a Leave Without Pay ("LWOP") status for two hours. *See* Pl.'s Ex. M, ECF No. 48-3 at 287.

A few days later, Mr. Lilly was referred by MPD officials for a Psychological Fitness for Duty Evaluation. Pl.'s Ex. F, ECF No. 48-3 at 182; Def.'s Ex. N, ECF No. 45-3 at 234. Dr.

Gloria Morote ("Dr. Morote"), a licensed clinical psychologist, evaluated Mr. Lilly on October 10, 2012 and October 24, 2012, alongside MPD referral documents informing her that "following a period of good service[,] Officer Lilly's performance and appearance began to deteriorate in August/September 2012[,]" including "two major investigations for neglect of duty," "deterioration" in his mental condition, and "marked nervousness and erratic behavior while on-duty after an exposure to bedbugs." Pl.'s Ex. F, ECF No. 48-3 at 182-83; Def.'s SOF Reply, ECF No. 54-1 at 8 ¶ 51. Following her evaluation, Dr. Morote concluded that Mr. Lilly should remain on limited duty status due to his continued "struggle with symptoms of a mood disorder, specifically anxiety with obsessive features, to the degree that can adversely impact his ability to perform the requirements of the job." Pl.'s Ex. F, ECF No. 48-3 at 187.

On October 13, 2012, Mr. Lilly received an Annual Performance Rating of "Does Not Meet Expectations" for the period between October 1, 2011 and September 30, 2012, which was "significantly lower" than his prior rating. Pl.'s Ex. Q, ECF No. 48-3 at 295. In addition, between February 2011 and November 2012, Mr. Lilly was disciplined for various incidents of tardiness and for being absent without official leave ("AWOL"). *See, e.g.*, Pl.'s Ex. L, ECF No. 48-3 at 285 (notifying Mr. Lilly on February 11, 2011 of his one minute of tardiness and placing

him in LWOP status for one hour); Pl.'s Ex. M, ECF No. 48-3 at
287 (notifying Mr. Lilly on September 29, 2012 of his two hours
of tardiness and placing him in LWOP status for two hours);
Pl.'s Ex. N, ECF No. 48-3 at 289 (notifying Mr. Lilly on
November 3, 2012 of his two hours of tardiness and placing him
in LWOP status for two hours); Pl.'s Ex. O, ECF No. 48-3 at 291
(notifying Mr. Lilly on November 27, 2012 that he was placed in
AWOL status following his six-hour absence on November 20,
2012); *see also* Def.'s SOF Reply, ECF No. 54-1 at 7 ¶¶ 41-44.

### 3. Events from the Final Year of Mr. Lilly's MPD Employment Leading up to His Retirement

On January 7, 2013, IAB's Internal Affairs Division ("IAD")
was notified that the Executive Office of the Chief of Police
received an anonymous email complaint alleging that Mr. Lilly
had "conducted himself in a manner that was unbecoming of a[n
MPD] police officer." *See* Def.'s Ex. N, ECF No. 45-3 at 225. The
complainant claimed that Mr. Lilly had posted an inappropriate
video on YouTube and was "mentally ill" and a "disgrace" to MPD.
*Id.* IAD opened an investigation, and Mr. Lilly and his direct
supervisor, Sergeant Christopher Moore, were interviewed. *Id.* at
227-28. Following the interviews and IAD's review of twenty-six
videos involving Mr. Lilly singing on YouTube, it concluded in a
report dated April 17, 2013 that there was no evidence to
support that he had "demonstrated conduct that was unbecoming of

a police officer[,]" as he never identified himself as an officer or wore clothing or other emblems that would identify him as such in the videos. *Id.* at 233-34. Moreover, IAD found that "in the videos, Officer Lilly [was] exercising his right to Freedom of Speech and Freedom of Expression," and it recommended that the investigation be closed due to "insufficient facts." *Id.* at 234. However, because IAD was not equipped to assess Mr. Lilly's mental condition, it forwarded the allegation regarding his mental status to MPD's PFC for review. *Id.* at 235.

On January 22, 2013, MPD notified Mr. Lilly that he was being placed in a "chargeable sick leave status" since he failed to request approval to continue working under limited duty status beyond the period granted to him in September 2012, as required by MPD policy. *See* Pl.'s Ex. S, ECF No. 48-3 at 306. Thereafter, Mr. Lilly submitted a request to extend his limited duty status by thirty days, *see* Pl.'s Ex. T, ECF No. 48-3 at 308; which was granted, *see* Pl.'s Ex. U, ECF No. 48-3 at 310. Mr. Lilly was detailed to the Investigative Services Bureau, Youth Investigations Division ("YID"), effective March 17, 2013, *see* Def.'s Ex. L, ECF No. 45-3 at 207; until early May 2013, when he returned to 4D under limited duty status, *see* Def.'s Ex. Q, ECF No. 45-3 at 247-48; Def.'s Ex. R, ECF No. 45-3 at 250. Following his return, Mr. Lilly alleges the "verbal torture[] and ridicule" continued, including the name calling of "faggot,"

"drama queen," "bedbug 2.0.," and "fairy." Am. Compl., ECF No. 9 at 16 ¶ 77; Pl.'s Opp'n, ECF No. 48-1 at 19.

In 2013, Mr. Lilly reported late to work on several occasions. On January 26, 2013, Mr. Lilly notified his watch commander that he had taken Ambien—a prescription medication—and overslept, causing him to be AWOL for eight hours and not report for work that day. *See* Def.'s Ex. J, ECF No. 45-3 at 187-88, 190-91 (showing that IAB investigated this AWOL incident and cited Mr. Lilly for adverse action); Def.'s SOF Reply, ECF No. 54-1 at 3 ¶ 14. Four days later, on January 30, 2013, Mr. Lilly was AWOL again for five hours and fifteen minutes. *See* Def.'s Ex. K, ECF No. 45-3 at 201. Mr. Lilly told his superiors that he was late because he had an appointment, realized he forgot his cell phone, and drove home to get it before reporting for duty, but later admitted that he overslept. *See id.* at 197, 200-03 (showing that IAB investigated this incident and cited Mr. Lilly for being AWOL and making false statements to his superior officers); Def.'s SOF Reply, ECF No. 54-1 at 3 ¶¶ 15-17.

A few months later, on April 18, 2013, Mr. Lilly again reported late to work by five and a half hours. *See* Def.'s Ex. O, ECF No. 45-3 at 237-38; Def.'s SOF Reply, ECF No. 54-1 at 4 ¶ 24. While initially claiming that he overslept, upon arriving at work, Mr. Lilly admitted to his superior officer that he had been having an anxiety attack. *See* Def.'s Ex. O, ECF No. 45-3 at

11

241-43 (showing that IAB investigated this incident and cited Mr. Lilly for being AWOL and making false statements to his superior officers); *see also* Def.'s Ex. S, ECF No. 45-3 at 252 (imposing a five day suspension due to Mr. Lilly's various AWOL incidents but holding all five in abeyance for twelve months).

Mr. Lilly filed a witness statement, dated April 18, 2013, about this April AWOL incident, attributing his oversleeping to "work-related issues." *See* Def.'s Ex. P, ECF No. 45-3 at 245. In this statement, he also reported an incident from the prior week, in which he claimed to hear YID employees making fun of the "coming out process" in the presence of senior officials who "did not stop it."[4] *See id.*; Pl.'s Ex. B, ECF No. 48-3 at 190:1-194:1; Def.'s Ex. I, ECF No. 45-3 at 149-50; Def.'s SOF Reply, ECF No. 54-1 at 4 ¶ 25. MPD's EEO Compliance Branch investigated Mr. Lilly's claim but did not find any evidence to support it and concluded that Mr. Lilly was not "subjected to an atmosphere of sufficiently severe or pervasive harassment" based on the alleged statement. *See* Def.'s Ex. I, ECF No. 45-3 at 130.

On April 11, 2013, two U.S. Park Police officers contacted MPD after they encountered Mr. Lilly walking near a ravine on the shoulder of the George Washington Memorial Parkway. *See*

---

[4] Mr. Lilly claims that his coworkers engaged in "bad hate" jokes by chanting "Sergeant Z's coming out of the closet, Sergeant Z's -- like I'm a fairy faggot, I'm a fairy faggot coming out of the closet." Pl.'s Ex. B, ECF No. 48-3 at 193:1-194:1.

Def.'s Ex. M, ECF No. 45-3 at 209, 214-15; Def.'s SOF Reply, ECF No. 54-1 at 3-4 ¶ 19. When questioned by the officers, Mr. Lilly identified himself as an MPD officer and displayed a duplicate copy of his MPD badge, despite his police powers having been revoked in September 2012. *See* Def.'s Ex. F, ECF No. 45-3 at 90; Def.'s Ex. M, ECF No. 45-3 at 215; Def.'s SOF Reply, ECF No. 54-1 at 4 ¶ 20. IAB opened an investigation into this incident, which led Mr. Lilly to be cited for corrective action in the form of an official reprimand for displaying his spare MPD badge while his police powers were revoked. Def.'s Ex. M, ECF No. 45-3 at 215. IAB concluded that this conduct was "prejudicial to the reputation and good order of the police force" and "detrimental" to MPD in violation of MPD's General Order 120.21. *Id.*

Then, on April 19, 2013, MPD's PFC issued its formal recommendation (via a written report by Dr. Morote) to the PFRRB that Mr. Lilly be considered for disability retirement. Def.'s Ex. D, ECF No. 45-3 at 69, 74. The report noted that Mr. Lilly had been on limited duty status since September 2012 "following deterioration in his work performance and emotional stability after an exposure to bedbugs." *Id.* at 74. The report reviewed Mr. Lilly's medical records[5] and mental health history to

---

[5] This review included Mr. Lilly's completion of a January 31, 2013 Psychometric Test (a six-page questionnaire). *See* Pl.'s Ex. R, ECF No. 48-3 at 299-304.

conclude that he "continue[d] to struggle with symptoms of a mood disorder . . . that [could] adversely impact his ability to perform" and was presenting "with symptoms of depression, anxiety, and behavioral disinhibition which disable[d] his insight and capacity to function as a police officer." *Id.* at 69, 74. The PFC submitted its recommendation to the PFRRB pursuant to D.C. Code §§ 5-633 and 5-634, which provide that "regardless of whether the prognosis is that the member will be able to perform the full range of duties after achieving maximum medical improvement, the Director shall process for retirement, pursuant to § 5-710, those members of the [MPD] who spend all or part of 172 cumulative work days in a less-than-full-duty status over a 2-year period as a result of any one performance-of-duty [or non performance-of-duty] injury or illness, including any complications relating to the injury or illness." *Id.* at 74-75.

On May 22, 2013, Mr. Lilly was placed on administrative leave, Def.'s SOF Reply, ECF No 54-1 at 5 ¶ 28; after "rambling" with "glassy" eyes to a commanding officer about being sent by his family to a "funny farm," *see* Def.'s Ex. R, ECF No. 45-3 at 250. The commanding officer thereafter made requests to have Mr. Lilly removed from 4D limited duty. *Id.* Then, on May 31, 2013, Mr. Lilly self-admitted into Dominion Hospital, a mental health facility in Virginia, to receive psychiatric treatment. *See* Def.'s Ex. AA, ECF No. 45-3 at 289; Def.'s Ex. BB, ECF No. 45-3

14

at 294. He was also later investigated by IAB regarding whether he provided false information about his mental health history in his recruitment package, allegations which were sustained in IAB's final investigative report dated August 8, 2013. *See* Def.'s Ex. T, ECF No. 45-3 at 257-58; Def.'s SOF Reply, ECF No. 54-1 at 6 ¶ 34.

After conducting an evidentiary hearing on July 18, 2013, Pl.'s Ex. A, ECF No. 48-3 at 12; on August 9, 2013, the PFRRB issued an interim order determining that Mr. Lilly was "incapacitated from further duty by reason of a disability incurred in the performance of duty after more than five years of creditable service[,]" effective August 16, 2013, Def.'s Ex. W, ECF No. 45-3 at 271. The PFRRB finalized this interim order on December 5, 2013. *See* Def.'s Ex. X, ECF No. 45-3 at 276.[6]

### B. Procedural Background

Mr. Lilly made internal complaints to MPD on the following dates: (1) October 29, 2012, when he notified MPD supervisor Sergeant Audra Smith about the 2011 locker incident, *see* Pl.'s Exs. D & E, ECF No. 48-3 at 178, 180; Def.'s SOF Reply, ECF No. 54-1 at 8 ¶ 50; (2) January 13, 2013, when he emailed Sergeant Carlos Mejia of MPD's Gay and Lesbian Unit to follow up on his

---

[6] Mr. Lilly was later informed that he owed a fine of $3,559.20 to MPD because he retired prior to serving a fifteen-day suspension that was served to him on April 8, 2013. *See* Def.'s Exs. U & V, ECF No. 45-3 at 264, 266, 269.

report about the 2011 locker incident, *see* Def.'s Ex. H, ECF No. 45-3 at 122-24; and (3) April 18, 2013,[7] when he reported conduct making fun of the "coming out process" that occurred in the presence of YID officials, *see* Def.'s Ex. I, ECF No. 45-3 at 149-50. Both the locker incident and the incident during Mr. Lilly's YID detail were investigated by MPD's EEO Compliance Branch, and those findings were detailed in its final investigative report, dated May 23, 2013. *See generally id.*

On March 11, 2014, Mr. Lilly filed a Charge of Discrimination with the Alexandria Office of Human Rights, which was cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC").[8] *See* Def.'s Ex. Y, ECF No. 45-3 at 279; Def.'s SOF Reply, ECF No. 54-1 at 6 ¶ 40. Mr. Lilly amended his charge twice, on March 13, 2014 and March 19, 2014, "adding allegations that the locker incident was not properly investigated; that he was forced to retire; and that he was not receiving full retirement benefits." Def.'s Mot., ECF No. 45 at 10; Pl.'s Opp'n, ECF No. 48-1 at 20; *see* Def.'s Ex. Y, ECF No.

---

[7] Both Mr. Lilly and the District identified April 17, 2013 as the date of this reporting. *See* Def.'s Mot., ECF No. 45 at 10; Pl.'s Opp'n, ECF No. 48-1 at 20. However, Mr. Lilly's "Complainant/Witness Statement" reporting this incident is dated April 18, 2013. *See* Def.'s Ex. I, ECF No. 45-3 at 149.

[8] Mr. Lilly's charge checked the "boxes" for discrimination based on sex, retaliation, and disability. *See* Def.'s Ex. Y, ECF No. 45-3 at 279. However, none of the counts in Mr. Lilly's complaint allege discrimination based on disability, so the Court does not analyze it. *See* Am. Compl., ECF No. 9 at 18-30.

45-3 at 279-82. On February 12, 2015, the EEOC denied Mr.
Lilly's claim and mailed him his right-to-sue letter, which he
received on March 23, 2015. *See* Compl., Ex. A, ECF No. 1-3 at 1;
Compl., Ex. B, ECF No. 1-4 at 1; Compl., Ex. C, ECF No. 1-5 at
1; Am. Compl., ECF No. 9 at 18 ¶ 92. On May 16, 2015, Mr. Lilly
filed this action, asserting Title VII and DCHRA claims, along
with constitutional claims under 42 U.S.C. § 1983. *See* Compl.,
ECF No. 1 at 1-2; Am. Compl., ECF No. 9 at 1.

On January 7, 2016, the District moved to dismiss Mr.
Lilly's constitutional claims. *See* Def.'s Mot. to Dismiss, ECF
No. 13 at 1. The Court granted the District's partial motion to
dismiss on September 26, 2016, *see* Order, ECF No. 18 at 1; and
the District filed its answer as to Mr. Lilly's remaining claims
on October 12, 2016, *see* Def.'s Answer, ECF No. 20. On August 9,
2018, the District filed the present Motion for Summary Judgment
along with exhibits. *See* Def.'s Mot., ECF No. 45; Def.'s Errata
& Exs., ECF No. 46. Mr. Lilly filed his opposition and
accompanying exhibits on October 19, 2018, *see* Pl.'s Opp'n, ECF
No. 48; to which the District replied on February 5, 2019, *see*
Def.'s Reply, ECF No. 54.

While the District's present motion was pending, it
requested leave to file an amended answer on February 11, 2019.
*See* Def.'s Contested Mot. for Leave to Amend its Answer, ECF No.
61. The case was stayed, *see* Minute Order (Feb. 28, 2019); until

17

the Court granted this motion, allowing the District "to amend its answer to add the statute of limitations as an affirmative defense," *see* Minute Order (Oct. 26, 2020). The District thereafter filed its amended answer on October 27, 2020. *See* Def.'s Am. Answer, ECF No. 67. The District's Motion for Summary Judgment is now ripe and ready for the Court's adjudication.

**III. Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (internal quotation marks omitted). On the other hand, to defeat summary judgment, the nonmoving party must "go beyond the pleadings" to designate specific facts showing that there is a genuine issue of material fact for trial. *Id.* at 324. A material fact is one that is capable of affecting the outcome of the litigation, while a genuine dispute is one in which "the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). The nonmoving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence" in the record. *Musgrove v. Dist. of Columbia*, 775 F. Supp. 2d 158, 164 (D.D.C. 2011), *aff'd*, 458 F. App'x 1 (D.C. Cir. 2012); *Celotex*, 477 U.S. at 324. Furthermore, in the summary judgment analysis, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## IV.  Analysis

Mr. Lilly alleges three claims under Title VII and the DCHRA: (1) discrimination based on gender and sexual orientation; (2) hostile work environment; and (3) retaliation. *See* Am. Compl., ECF No. 9 at 23–30. Because the legal standards for establishing these claims under Title VII and the DCHRA are substantively the same, *see Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (explaining that, "[i]n interpreting its Human Rights Act[,] the District of Columbia . . . generally seems ready to accept the federal constructions of Title VII, given the substantial similarity between it and the [DCHRA]"); the Court will analyze Mr. Lilly's claims under these statutes together, first outlining the applicable legal

standards for these three claims below, *see Williams v. Dist. of Columbia*, 317 F. Supp. 3d 195, 199 (D.D.C. 2018).

Under Title VII and the DCHRA, an employer cannot "discriminate against any individual with respect to his . . . employment, because of [his] race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1); D.C. Code § 2-1402.11 (including discrimination based on sexual orientation). To establish discrimination, Mr. Lilly must prove two elements: (1) he suffered an adverse employment action (2) because of his gender or sexual orientation. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). If he succeeds in doing so, the burden shifts to the District "to articulate some legitimate, nondiscriminatory reason for the [adverse action]." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089 (1981). The District's burden is satisfied if it "explains what [it] has done or produc[es] evidence of legitimate nondiscriminatory reasons." *Id.* at 256 (internal quotation marks omitted). Then, the burden shifts back to Mr. Lilly "to prove by a preponderance of the evidence that the legitimate reasons offered by the [District] were not its true reasons, but were a pretext for discrimination." *Id.* at 253.

To establish a hostile work environment claim, Mr. Lilly must show that: "(1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment

occurred because of [his] protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the [District] knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford [him] prompt remedial action." *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 152 (D.D.C. 2013). Whether Mr. Lilly's MPD workplace was actionably hostile involves a subjective and objective analysis, *i.e.*, Mr. Lilly must have subjectively perceived the environment to be hostile, *see Carter-Frost v. Dist. of Columbia*, 305 F. Supp. 3d 60, 75 (D.D.C. 2018); and the conduct must have been "sufficiently severe or pervasive to alter the conditions of [his] employment and [objectively] create an abusive working environment[,]" *Dudley*, 924 F. Supp. 2d at 152 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993)). Under the objective prong, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interfere[d] with [Mr. Lilly's] work performance[,]" *Baloch v. Kempthorne,* 550 F.3d 1191, 1201 (D.C. Cir. 2008); as "simple teasing, offhand comments, and isolated incidents" do not amount to actionable workplace harassment, *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275 (1998).

Finally, to establish a retaliation claim, Mr. Lilly must show that: (1)he engaged in statutorily protected activity; (2) he suffered a materially adverse action by the District; and (3) a causal link connects the two. *See Carter-Frost*, 305 F. Supp. 3d at 73 (citing *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)). Upon this showing, the burden shifts to the District "to articulate a legitimate, non-retaliatory reason for its actions," and if it does so, the burden returns to Mr. Lilly to prove that the "asserted non-retaliatory reason was mere pretext for retaliation." *Id.* (citing *Jones*, 557 F.3d at 677). The "sole remaining question" thus becomes "whether, based on all the evidence, a reasonable jury could conclude that [the] proffered reason was" not the real reason for the adverse action and that the District intentionally retaliated against Mr. Lilly. *Pardo-Kronemann v. Donovan,* 601 F.3d 599, 604 (D.C. Cir. 2010); *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Mr. Lilly's complaint alleges a range of discriminatory and retaliatory conduct spanning several years of his employment with MPD. "However, the Court must be careful about which events it can and cannot consider[,]" as before determining whether each of the alleged events meets the above standards for discrimination, hostile work environment, and retaliation claims, the Court must assess whether Mr. Lilly has properly and timely exhausted his administrative remedies. *See Dudley*, 924 F.

Supp. 2d at 154; *see also Pierson v. Wash. Metro. Area Transit Auth.*, 821 F. Supp. 2d 360, 364 (D.D.C. 2011) ("In actions brought under Title VII, a court has authority over only those claims that are (1) contained in the plaintiff's administrative complaint or claims 'like or reasonably related to' those claims in the administrative complaint[,] and (2) claims for which the plaintiff exhausted administrative remedies."). As such, the Court first discusses these procedural requirements before turning to the merits of Mr. Lilly's claims.

### A. Mr. Lilly's Claims Under Title VII and the DCHRA Are, in Part, Procedurally Time-Barred

As an initial matter, the District argues that Mr. Lilly's "hostile work environment claims and most of his discrete claims of discrimination and retaliation should be dismissed." Def.'s Mot., ECF No. 45 at 13. Specifically, the District argues that Mr. Lilly's Title VII claims that accrued prior to May 15, 2013[9] should be barred as untimely, and in addition, for failure to exhaust, as it contends that "most of the challenged employment actions that [Mr. Lilly] alleges in the Amended Complaint" were not raised in his filed Charge of Discrimination. *Id.* at 12-13. In addition, the District argues that Mr. Lilly's DCHRA claims

---

[9] The District initially alleged that Mr. Lilly's Title VII claims prior to May 13, 2013 should be time-barred, *see* Def.'s Mot., ECF No. 45 at 12-13; but it corrected this date to May 15, 2013 in its Reply brief, *see* Def.'s Reply, ECF No. 54 at 2 n.1.

that accrued prior to June 13, 2013 should also be barred as untimely under that Act. *Id.* at 14-15. Mr. Lilly opposes these procedural arguments, contending that all of his Title VII and DCHRA claims are timely because they were part of a "continuing violation," which benefits from the rule that just one act that is part of the hostile work environment need be timely for the Court to consider the whole spectrum of conduct, untimely acts included. *See* Pl.'s Opp'n, ECF No. 48-1 at 22-26. In addition, Mr. Lilly argues that the District failed to raise a timeliness argument in its Rule 12(b)(6) motion to dismiss and therefore waived its right to raise a statute of limitations defense and should not now get "a second bite at the apple[.]" *Id.* at 25. The District replies that: (1) the "alleged discriminatory acts pleaded by" Mr. Lilly are "separate and distinct discrimination claims" rather than "a continuing pattern of discrimination;" and (2) its exhaustion and "time barred defense[s] ha[ve] not been waived." *See* Def.'s Reply, ECF No. 54 at 1-9.

        **1. Title VII: Mr. Lilly's Hostile Work Environment Claim Is Time-Barred, Along with All Alleged Discrete Discriminatory or Retaliatory Acts Prior to May 15, 2013**

The Court begins by assessing exhaustion under Title VII, which "requires that an employee exhaust [his] administrative remedies by filing a claim with the EEOC prior to filing suit in the district court." *Headen v. Wash. Metro. Area Transit Auth.*,

24

741 F. Supp. 2d 289, 294 (D.D.C. 2010). The Act "provides detailed procedures for bringing administrative charges, and . . . 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *Dudley*, 924 F. Supp. 2d at 154 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S. Ct. 2061 (2002)). Specifically, Title VII requires an aggrieved employee to file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred," but extends this period to 300 days if the employee "has [first] instituted proceedings with a State or local agency." *Dieng v. Am. Insts. for Rsch. in Behav. Scis.*, 412 F. Supp. 3d 1, 12 (D.D.C. 2019) (citing 42 U.S.C. § 2000e-5(e)(1)). "Only after the EEOC has notified the aggrieved person of its decision to dismiss or its inability to bring a civil action within the requisite time period can that person bring a civil action [himself]." *Park v. How. Univ.,* 71 F.3d 904, 907 (D.C. Cir. 1995). The aggrieved employee has ninety days following receipt of that notice to commence a civil action. *Akridge v. Gallaudet Univ.,* 729 F. Supp. 2d 172, 177-78 (D.D.C. 2010) (citing 42 U.S.C. §§ 2000e-5(f)(1), 12117(a)).[10]

---

[10] Although the District notes that Mr. Lilly filed this action ninety-three days after the EEOC issued his right-to-sue notice on February 12, 2015, it does not appear to contest Mr. Lilly's conformance with the ninety-day right-to-sue period, as it notes that the ninety-day countdown does not begin "until the date of receipt of the right-to-sue notice[,]" which Mr. Lilly states

The parties do not dispute that Mr. Lilly benefits from the 300-day extension period, as he first "instituted proceedings with a State or local agency," *see* 42 U.S.C. § 2000e-5(e)(1); and his claims were then cross-filed with the EEOC, *see Craig v. Dist. of Columbia*, 881 F. Supp. 2d 26, 31 (D.D.C. 2012); Def.'s Ex. Y, ECF No. 45-3 at 279. Pursuant to Title VII, Mr. Lilly was thus required to file his Charge of Discrimination "within three hundred days after the alleged unlawful employment practice occurred[.]" 42 U.S.C. § 2000e-5(e)(1). Here, Mr. Lilly filed his charge on March 11, 2014. *See* Def.'s Ex. Y, ECF No. 45-3 at 279. Calculating 300 days backwards from that date, only Title VII claims occurring on or after May 15, 2013 fall within the timely filing window. *See* Def.'s Reply, ECF No. 54 at 2 n.1.

However, the U.S. Supreme Court has determined that Title VII applies different limitations rules for hostile work environment claims and "discrete discriminatory act" claims. *See Singletary v. Dist. of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003) (citing *Morgan*, 536 U.S. at 113). For discrete retaliatory or discriminatory acts like terminations, each act "starts a new clock for filing charges alleging that act[,]" and these acts become "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536

---

was March 23, 2015. *See* Def.'s Mot., ECF No. 45 at 14 n.6; Am. Compl., ECF No. 9 at 18 ¶ 92.

U.S. at 113. In contrast, hostile work environment claims "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct[,]" *i.e.*, "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 115, 117. Accordingly, the limitations rule for hostile work environment claims provides that when "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* at 117. In other words, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122; *Singletary*, 351 F.3d at 526-28; *Craig*, 881 F. Supp. 2d at 32 ("Because a hostile work environment claim aggregates numerous occurrences, . . . plaintiffs need only allege that one or more contributing acts occurred within the relevant time period.").[11]

The parties agree that "[u]nless the discriminatory acts pleaded by [Mr. Lilly] constitute a continuing pattern of discrimination, each [discrete] claim must have occurred within the 300-day period before the charge was filed." *See* Def.'s

---

[11] This same division between the limitations rules for discrete discriminatory acts and hostile work environment claims under Title VII applies to the equivalent DCHRA claims. *See Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245-47 (D.C. 2009).

Reply, ECF No. 54 at 1, 7-8; Pl.'s Opp'n, ECF No. 48-1 at 22-23.
Therefore, to the extent that Mr. Lilly alleges any discrete
instances of discrimination or retaliation prior to May 15,
2013, the Court concludes that they are time-barred under Title
VII. However, the parties debate whether many of the alleged
acts that occurred between 2010 and Mr. Lilly's retirement date
are "discrete discriminatory acts" that are mostly time-barred,
or are instead all "part of the same actionable hostile work
environment practice," where only one act need be timely for the
whole series of conduct to be considered. *Singletary*, 351 F.3d
at 526-27; *compare* Def.'s Reply, ECF No. 54 at 2-3 (listing all
of the alleged acts the District views as "separate and distinct
discrimination claims" that "were required to be filed by May
15, 2013," and are thus "time-barred"), *with* Pl.'s Opp'n, ECF
No. 48-1 at 23 (alleging a continuing pattern of "intentional
and persistent derogatory comments towards [Mr. Lilly]" and
harassment, "which continued through his involuntary retirement"
and included acts occurring after May 15, 2013).

The Court is unpersuaded that Mr. Lilly has sufficiently
alleged an ongoing hostile work environment claim up until the
date that he was effectively retired. As noted by the District,
Mr. Lilly returned to MPD 4D following his detail to YID on May
5, 2013, *see* Def.'s Ex. Q, ECF No. 45-3 at 247-48; but he was
placed on administrative leave on May 22, 2013, *see* Def.'s Ex.

R, ECF No. 45-3 at 250; and shortly thereafter, on May 31, 2013, he self-admitted to Dominion Hospital to receive psychiatric treatment, *see* Def.'s Ex. AA, ECF No. 45-3 at 289; Def.'s Ex. BB, ECF No. 45-3 at 294. Thus, following May 22, 2013, Mr. Lilly was not in a position to experience any alleged "discriminatory intimidation, ridicule, and insult[,]" as he was no longer an active participant in MPD's working environment. *See Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245-46 (D.C. 2009) (determining that a conversation between the former employee and her employer regarding her termination did not make her hostile work environment claim timely, as that conversation "simply was not part of the work environment—appellant had not been in the workplace for months" due to medical leave). Nor is Mr. Lilly permitted to "bootstrap" any timely alleged discrete acts of retaliation or discrimination into his broader hostile work environment claim. *See Marcus v. Yellen*, No. 09-1686, 2022 WL 3910568, at *23 (D.D.C. Aug. 31, 2022) (citation omitted). Thus, the Court is only left with the question of whether Mr. Lilly has alleged *any* timely acts contributing to his hostile work environment claim between May 15, 2013 and May 22, 2013 (the date he was placed on administrative leave), such that the Court can consider "the entire time period of the hostile environment" to determine the District's liability. *See Morgan*, 536 U.S. at 117; Def.'s Mot., ECF No. 45 at 12 (noting that Mr. Lilly only

29

worked seven days out of the 300-day Title VII filing period—May 15, 2013 to May 21, 2013—so any act making his hostile work environment claim timely must have occurred during that window).

As the District notes, "[t]he only evidence" to support a hostile work environment claim that Mr. Lilly "was subject to any discriminatory name-calling or derogatory comments on or after May 1[5], 2013, is [his] sworn testimony." Def.'s Mot., ECF No. 45 at 13. The District points to Mr. Lilly's deposition testimony that he experienced name-calling "every day" following being "outed" as gay in December 2010 and that he was sexually harassed "non-stop" and "constantly" by Officers Clifford and Pinto. *See id.*; Def.'s Ex. C, ECF No. 45-3 at 143:1-144:8, 149:9-20. As to the seven-day time period at issue, Mr. Lilly claims he has "allege[d] acts that took place . . . after May 1[5], 2013," including "persistent derogatory comments" and "harassment based on sexual orientation and personal appearance[.]" Pl.'s Opp'n, ECF No. 48-1 at 23. Yet, he does not cite to his sworn testimony to support this statement, nor indicate anywhere in the record that might prove that a hostile event occurred between May 15, 2013 and May 21, 2013. In fact, the Court only located this specific time period in Mr. Lilly's Amended Complaint, in which he alleged that following May 16, 2013, "the discriminatory verbal torture[] and ridicule due to [his] sexual orientation" continued and "[h]is environment

remained hostile" due to "[n]ame calling such as 'faggot,'
'drama queen,' and 'bedbug 2.0[.]'" *See* Am. Compl., ECF No. 9 at
16 ¶¶ 76-77. Of note, however, the pleadings are factually
inconsistent with the record, as the Amended Complaint does not
mention that Mr. Lilly was placed on administrative leave on May
22, 2013, and instead alleges that he continued to work and
experience discriminatory actions "[o]ver the course of June
2013 through July 2013" until he was admitted into Dominion
Hospital, when the record instead shows that he self-admitted on
May 31, 2013. *Compare id.* at 16 ¶ 78, *with* Def.'s Ex. R, ECF No.
45-3 at 250, *and* Def.'s Ex. AA, ECF No. 45-3 at 289.

Drawing all reasonable inferences in his favor, the Court
is not persuaded that Mr. Lilly has met his burden to defeat
summary judgment as to the timeliness of his hostile work
environment claim. Mr. Lilly is required to "go beyond the
pleadings" to designate specific facts showing a genuine dispute
as to the existence of a timely hostile act to support his
claim, *see Celotex*, 477 U.S. at 324; but instead, his opposition
consists of "mere unsupported allegations" that are not backed
by any affidavits or "other competent evidence" in the record,
*Musgrove*, 775 F. Supp. 2d at 164; *see also Morgan v. Fed. Home
Loan Mortg. Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*,
328 F.3d 647 (D.C. Cir. 2003) ("While summary judgment must be
approached with special caution in discrimination cases, a

plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."); *Bolden v. Winter*, 602 F. Supp. 3d 130, 136 (D.D.C. 2009) (prohibiting a court on summary judgment from "overlook[ing] a plaintiff's failure to submit evidence that creates a genuine factual dispute").

Even Mr. Lilly's "direct testimonial evidence," which can be used to defeat summary judgment, *see Pierson*, 821 F. Supp. 2d at 364 (quoting *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006)); does not specifically mention the relevant seven-day time period. Instead, his deposition testimony only generalizes with "vague, self-serving allegations" that the discriminatory name-calling and comments were "daily" and the harassment "constant," which is "not sufficient evidence to create a dispute of material fact." *Carter-Frost*, 305 F. Supp. 3d at 74. The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has indicated that summary judgment "is *most likely* when a plaintiff's claim is supported solely by [his] own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence [in the record], . . . or other persuasive evidence that the plaintiff has deliberately committed perjury." *Arrington*, 473 F.3d at 343 (Brown, J. concurring in part). Here, there is no allegation of perjury, but the allegations in the Complaint are

undermined by other credible evidence in the record, and Mr. Lilly's sworn testimony remains unsupported by any corroborating evidence. *Cf. Craig v. Dist. of Columbia*, 74 F. Supp. 3d 349, 373 n.23 (D.D.C. 2014) (considering the plaintiff's testimony on summary judgment only because there was no suggestion of perjury or any evidence that undermined or contradicted his claims). These issues directly challenge the existence of a genuine dispute and make Mr. Lilly's hostile work environment claim "insufficiently meritorious to warrant the expense of a jury trial." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

The parties disagree as to the weight the Court should assign to Mr. Lilly's "self-serving testimony." *Compare* Def.'s Mot., ECF No. 45 at 13 ("A jury that credited [Mr. Lilly's] testimony in its entirety could not conclude that any of these incidents continued to occur after May 1[5], 2013."), *and* Def.'s Reply, ECF No. 54 at 8 ("[Mr. Lilly's] self-serving testimony, at times relying on hearsay, is insufficient[.]"), *with* Pl.'s Opp'n, ECF NO. 48-1 at 24 ("Plaintiff's own testimony can be enough to withstand [the District's] summary judgment motion, and it[ is] the jury, not the Court, that has to judge [Mr. Lilly's] credibility."). To support his position, Mr. Lilly points to the D.C. Circuit's opinion in *Desmond v. Mukasey*, 530 F.3d 944 (D.C. Cir. 2008), where that court wrote that "there is no rule of law that the testimony of a discrimination plaintiff,

standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *Desmond*, 530 F.3d at 964 (internal quotation marks omitted); *see also Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) ("After all, evidence a party proffers in support of its cause will usually, in some sense, be 'self-serving.'").

While the Court credits the D.C. Circuit's decision in *Desmond*, the primary issue here is not that Mr. Lilly's deposition is "self-serving," as the Court accepts as true his "direct testimonial evidence" proffered in opposition to summary judgment, *see Greene*, 164 F.3d at 674 (citing *Anderson*, 477 U.S. at 255); *Pierson*, 821 F. Supp. 2d at 364; but rather that Mr. Lilly has "fail[ed] to submit evidence that creates a genuine factual dispute" for the time period in question, *Musgrove*, 775 F. Supp. 2d at 164. Apart from the Amended Complaint, which is (1) not a consideration "beyond the pleadings," *see Celotex*, 477 U.S. at 324; (2) not considered uncontroverted evidence, and (3) factually inconsistent with record evidence, it becomes readily apparent that the record, including Mr. Lilly's deposition testimony, is "woefully deficient" as to any *specific* instances of alleged harassment or discrimination that occurred between May 15, 2013 and May 21, 2013, *see Fed. Home*, 172 F. Supp. 2d at 104; Pl.'s Opp'n, ECF No. 48-1 at 23 (only generally alleging that acts of harassment occurred after May 15, 2013). "By

34

pointing to [this] absence of evidence[,]" the District may
succeed on summary judgment as to Mr. Lilly's hostile work
environment claim, *see Pierson*, 821 F. Supp. 2d at 364; as Mr.
Lilly has not adequately alleged "a systematic policy or
practice of discrimination," nor a single timely incident
"sufficiently related" to any alleged untimely incidents forming
"the same unlawful employment practice[,]" *see Morgan*, 536 U.S.
at 107, 122; *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir.
2011) (requiring timely and untimely incidents to be "linked
into a coherent hostile environment claim"). As such, the Court
concludes that Mr. Lilly's hostile work environment claim under
Title VII is time-barred, and furthermore that only alleged
discrete instances of discrimination or retaliation that
occurred on or after May 15, 2013 may proceed for further
analysis under Title VII.[12]

---

[12] The Court declines to analyze, as unnecessary, the District's
argument that Mr. Lilly's deposition testimony was based on
inadmissible hearsay and should not be considered on summary
judgment. *See* Def.'s Reply, ECF No. 54 at 8-9. In addition, the
Court rejects the District's broader exhaustion argument under
Title VII. *See* Def.'s Mot., ECF No. 45 at 12 n.5. The District
argues that Mr. Lilly's March 2014 charge "did not raise
allegations of name-calling, derogatory comments, sexual
harassment, or most of the challenged employment actions that he
alleges in the Amended Complaint[,]" and contends that even if
he "could show the timeliness of his claims, most of his claims
should still be dismissed for failure to exhaust." *Id.* However,
it is the District's "burden to prove by a preponderance of the
evidence that [Mr. Lilly] failed to exhaust [his] administrative
remedies[,]" and "[m]eager, conclusory allegations that [he]
failed to exhaust his administrative remedies will not satisfy

**2. DCHRA: Mr. Lilly's Hostile Work Environment Claim Is Time-Barred, Along with All Alleged Discrete Discriminatory or Retaliatory Acts Prior to June 16, 2013**

The District also argues that Mr. Lilly's DCHRA claims based on alleged incidents prior to June 13, 2013[13] are time-barred. *See* Def.'s Mot., ECF No. 45 at 14-15. The DCHRA requires that "[a] private cause of action . . . be filed . . . within one year of the unlawful discriminatory act, or the discovery thereof[.]" D.C. Code § 2-1403.16. However, "[t]he timely filing of a complaint with the [D.C. Office of Human Rights] . . . shall toll the running of the statute of limitations while the complaint is pending." *Craig*, 881 F. Supp. 2d at 33 (quoting D.C. Code § 2-1403.16(a)). Here, Mr. Lilly filed his Charge of Discrimination on March 11, 2014 with the Alexandria Office of Human Rights based on alleged violations of the DCHRA by

---

[that] burden." *Pierson v. Wash. Metro. Area Transit Auth.*, 821 F. Supp. 2d 360, 364 (D.D.C. 2011); *see also Brown v. Marsh*, 777 F.2d 8, 12 (D.C. Cir. 1985) (stating that the mere assertion of failure to exhaust is "clearly inadequate under prevailing regulations"). Here, the District has not made a "colorable showing of non-exhaustion," instead only making "meager representations" that fail to allege specific facts "reasonably establishing" non-exhaustion. *Brown*, 777 F.2d at 12-13; *see* Def.'s Mot., ECF No. 45 at 12 n.5 (citing to Mr. Lilly's charge but not pointing to specific places in the Complaint that deviate from the allegations raised in that charge). In fact, the District does not allege specifics regarding exhaustion until its Reply brief. *See* Def.'s Reply, ECF No. 54 at 10.
[13] The District changes this date in its reply brief to March 11, 2013 but does not specifically address why. *See* Def.'s Reply, ECF No. 54 at 4-7. The Court therefore proceeds with its own calculations as to the timeliness of Mr. Lilly's DCHRA claims.

"District government agencies, officials[,] or employees." D.C.
Code § 2-1403.03(b); *see* Def.'s Ex. Y, ECF No. 45-3 at 279;
Def.'s SOF Reply, ECF No. 54-1 at 6 ¶ 40. His claim was
automatically cross-filed with the EEOC in D.C., "which suffices
to toll the one-year statute of limitations for DCHRA claims."
*See Craig*, 881 F. Supp. 2d at 33; *Ibrahim v. Unisys Corp.*, 582
F. Supp. 2d 41, 45 (D.D.C. 2008) (noting a "worksharing
agreement" between the D.C. Office of Human Rights and the
EEOC). On February 12, 2015, the EEOC denied Mr. Lilly's claim
and issued his right-to-sue notice, and Mr. Lilly then filed
this lawsuit on May 16, 2015. *See* Compl., Ex. A, ECF No. 1-3 at
1. The DCHRA statute of limitations was thus tolled from March
11, 2014—the date Mr. Lilly filed his charge—until February 12,
2015—the date his complaint was no longer administratively
pending and the clock resumed running, *i.e.*, a period of
approximately eleven months. *See* D.C. Code § 2-1403.16(a).

Under the DCHRA, Mr. Lilly alleges discrimination,
retaliation, and hostile work environment claims through his
retirement date of August 16, 2013. *See* Pl.'s Opp'n, ECF No. 48-
1 at 25 (arguing that his DCHRA "claims are timely because he
has stated a continuing violation from 2011 until the date of
his discharge"). First, as to discrete acts, the DCHRA makes it
clear that any claims arising more than one year before Mr.
Lilly filed his charge are time-barred and do not benefit from

any tolling of the statute of limitations. *See* D.C. Code § 2-1403.16(a); Def.'s Reply, ECF No. 54 at 4. Subtracting 365 days from March 11, 2014—the date Mr. Lilly filed his charge—brings the Court to March 11, 2013, such that any discrete unlawful acts that occurred prior to March 11, 2013 are time-barred. The same is true for alleged discrete unlawful acts between March 11, 2013 and May 22, 2013—when Mr. Lilly was placed on administrative leave—which, even accounting for the eleven-month tolling period, are still beyond the DCHRA's one-year statute of limitations. Per the Court's calculations, the cut-off date for the timeliness of discrete unlawful acts under the DCHRA is June 16, 2013.[14] This is because there is 1 year, 11 months, and 1 day between June 16, 2013 and Mr. Lilly's civil action filing date of May 16, 2015, and 11 months and 1 day was the exact time that the DCHRA statute of limitations was tolled between March 11, 2014 and February 11, 2015 (the day before the clock resumed running once the EEOC denied Mr. Lilly's claim on February 12, 2015). Therefore, the Court concludes that any of Mr. Lilly's discrete discriminatory or retaliatory claims occurring prior to June 16, 2013 are time-barred under the DCHRA.

---

[14] The government appears to have incorrectly calculated this date as June 13, 2013. *See* Def.'s Mot., ECF No. 45 at 14.

Second, as to his DCHRA hostile work environment claim,[15] as noted, Mr. Lilly was no longer a participant in MPD's working environment after he was placed on administrative leave on May 22, 2013, *see* Def.'s Ex. R, ECF No. 45-3 at 250; so any incident contributing to "an ongoing pattern of discrimination" must have occurred on or before May 21, 2013, *see* Pl.'s Opp'n, ECF No. 48-1 at 26. However, as the Court just concluded, any incidents occurring prior to June 16, 2013 are time-barred. Because more than one year passed between any hostile act and the filing of this action (minus the time tolled), the Court concludes that Mr. Lilly's hostile work environment claim under the DCHRA is also time-barred. Therefore, only alleged discrete instances of discrimination or retaliation that occurred on or after June 16, 2013 may proceed for further analysis under the DCHRA.

### 3. The District Has Not Waived a Timeliness or Statute of Limitations Argument Under Title VII or the DCHRA

Mr. Lilly urges the Court not to "entertain" the District's timeliness arguments under Title VII and the DCHRA because he claims that this is the District's "second bite at the apple" in asserting such arguments. *See* Pl.'s Opp'n, ECF No. 48-1 at 25. Specifically, Mr. Lilly contends that the District: (1) failed

---

[15] *See supra* note 11 (explaining that the different limitations rules for discrete acts versus ongoing hostile work environment claims under Title VII also apply to claims under the DCHRA).

to raise timeliness arguments in its Rule 12(b)(6) motion; and
(2) waived its right to a statute of limitations defense because
the District did not raise this defense in its initial Answer.
*Id.* Mr. Lilly points to Federal Rule of Civil Procedure 12(g)(2)
as the basis for his argument, claiming that the District's
"belated untimeliness argument is barred by" that rule. *Id.*

Rule 12(g), in combination with Rule 12(h), "describe two
nonexhaustive ways in which" the Rule 12(b) defenses are waived.
*Gilmore v. Palestinian Interim Self-Gov't Auth.*, 8 F. Supp. 3d
9, 13 (D.D.C. 2014). Rule 12(g)(2) states that "a party that
makes a motion under this rule must not make another motion
under this rule raising a defense or objection that was
available to the party but omitted from its earlier motion."
Fed. R. Civ. P. 12(g)(2). Rule 12(h) provides that "[a] party
waives any defense listed in Rule 12(b)(2)-(5) by . . . omitting
it from a motion in the circumstances described in Rule
12(g)(2); or . . . failing to either: (i) make it by motion
under this rule; or (ii) include it in a responsive pleading[.]"
Fed. R. Civ. P. 12(h)(1). "The collective import of these two
provisions is that '[i]f a party files a Rule 12(b) motion to
dismiss, it may not subsequently assert any Rule 12(b) defenses
that were available when the first Rule 12(b) motion was
filed.'" *Gilmore*, 8 F. Supp. 3d at 13 (citation omitted); Pl.'s

Opp'n, ECF No. 48-1 at 25 (relying on *Gilmore* to advance Mr. Lilly's timeliness argument).

The Court concludes that Mr. Lilly's argument based on Rule 12(g)(2) is legally incorrect. First and foremost, that rule pertains to Rule 12(b) defenses only, which do not include any defenses pertaining to timeliness. *See* Fed. R. Civ. P. 12(b)(1)-(7). Instead, the statute of limitations, waiver, and other time-related defenses are considered "affirmative defenses" under Rule 8(c), which must be affirmatively raised in a responsive pleading and not in a Rule 12 motion. *See* Fed. R. Civ. P. 8(c)(1), 12(h). Second, even though the District filed an earlier Rule 12(b)(6) motion to dismiss that did not raise timeliness arguments, *see* Def.'s Mot. to Dismiss, ECF No. 13; it is not now making another motion under Rule 12 that "rais[es] a defense or objection that was available to [it] but omitted from its earlier motion." *See* Fed. R. Civ. P. 12(g)(2); *Gilmore*, 8 F. Supp. 3d at 13 (applying Rule 12(g)(2)'s rule to a situation where the defendants first moved to dismiss "[m]ore than a decade ago" for lack of subject matter jurisdiction under Rule 12(b)(1) and then later moved to dismiss based on a lack of personal jurisdiction under Rule 12(b)(2)). Instead of moving again under Rule 12, the District is now moving for summary judgment under Rule 56, and so the guidelines Mr. Lilly points

to under Rule 12(g)(2) are inapposite.[16] *See* Def.'s Reply, ECF
No. 54 at 7 (noting that in moving for summary judgment, the
District has presented evidence regarding the timeliness of Mr.
Lilly's claims, which the Court finds appropriate at this stage
of the litigation); *see also* Fed. R. Civ. P. 56(b) (allowing a
party to move for summary judgment "at any time until [thirty]
days after the close of all discovery").

The Court also rejects Mr. Lilly's argument that the
District waived its right to a statute of limitations defense by
failing to raise it as an affirmative defense in its initial
Answer. *See* Pl.'s Opp'n, ECF No. 48-1 at 25. Not only does Mr.
Lilly not provide any caselaw to support this argument, but also
the Court settled this issue on October 26, 2020 by granting the
District's motion requesting leave to amend its Answer to add
the statute of limitations as an affirmative defense. *See* Minute
Order (Oct. 26, 2020). Under that motion, Mr. Lilly also argued
that the District waived its statute of limitations defense
because it did not raise the argument in its Rule 12(b) motion
or its original Answer filed on October 12, 2016. *Id.* (citing
Pl.'s Opp'n to Def.'s Mot. for Leave to File First Am. Answer,

---

[16] The Court notes that the District uses the word "dismiss" when
arguing that Mr. Lilly's claims should be deemed time barred.
*See* Def.'s Mot., ECF No. 45 at 12-15. However, the District's
motion is not styled as a Rule 12(b) motion to dismiss but as a
Rule 56 motion for summary judgment. Thus, the Court does not
assign weight to this choice of language.

ECF No. 64 at 3-4). The Court rejected that argument, applying Rule 15(a)'s "generous standard" to "freely give leave" to the District to amend its Answer. *Id.* (citing Fed. R. Civ. P. 15(a)(2)). The Court also noted that the District "raised statute of limitations arguments in its motion for summary judgment based on the discovery produced" and that "adding this defense [did] not change the theory of the case, but is consistent with discovery already provided[,]" and also did not cause undue prejudice to Mr. Lilly. *Id.* The District thereafter timely filed its Amended Answer on October 27, 2020, writing that Mr. Lilly's claims "are barred, in whole or in part, by the applicable statute of limitations." Def.'s Am. Answer, ECF No. 67 at 15. This added affirmative defense, along with the District's previously raised defense that Mr. Lilly "failed to exhaust his administrative remedies and/or failed to comply with other mandatory filing requirements[,]" operate to negate Mr. Lilly's present argument that the District waived a statute of limitations defense under Title VII and the DCHRA. *Id.* at 14; *see* Def.'s Reply, ECF No. 54 at 4-5.

Because both Title VII and the DCHRA require the filing of charges of discrimination within a certain time period following the alleged unlawful incidents, Mr. Lilly cannot expect to be "waived into court" by bypassing the timely exhaustion requirements that these laws impose. *See Kizas v. Webster*, 707

F.2d 524, 544-46 (D.C. Cir. 1983) (labeling Title VII's statutory requirements "part and parcel of the congressional design" for complaints to initiate at the agency level rather than mere "technicalit[ies]"). As such, the Court reiterates its prior conclusions that: (1) Mr. Lilly's hostile work environment claim is barred under Title VII and the DCHRA;[17] (2) Mr. Lilly's allegations of discrete discriminatory or retaliatory acts prior to May 15, 2013 are barred under Title VII; and (3) Mr. Lilly's allegations of discrete discriminatory or retaliatory acts prior to June 16, 2013 are barred under the DCHRA.

### B. Mr. Lilly Has Failed to Produce Sufficient Evidence from Which a Reasonable Jury Could Conclude that the District's Stated Reasons for the Alleged Discriminatory or Retaliatory Acts Are Pretextual

Mr. Lilly's remaining claims involve a mix of discrete discriminatory and retaliatory acts under Title VII and the DCHRA, including allegations "that he was subject to unwarranted

---

[17] Both parties proffer arguments regarding whether the District can be liable via a hostile work environment theory under Title VII and the DCHRA for the alleged sexual harassment by Officers Pinto and Clifford. *Compare* Def.'s Mot., ECF No. 45 at 15-17 ("Even if [Mr. Lilly's] claims of sexual harassment against two of his co-workers were not procedurally barred, the Court should grant summary judgment because their alleged misconduct cannot be imputed to the District."), *with* Pl.'s Opp'n, ECF No. 48-1 at 26-29 (claiming that Mr. Lilly "reported the sexual harassment by Officers Pinto and Clifford" but that "the District failed to implement prompt and corrective action" and can be held liable for this failure). The Court does not consider the merits of these arguments since it has concluded that Mr. Lilly's hostile work environment claim, which includes these sexual harassment allegations, is time barred under Title VII and the DCHRA.

investigations, excessive discipline, and forced to retire
because of his sexual orientation, gender, or in retaliation for
complaints he made about discrimination." Def.'s Mot., ECF No.
45 at 17. As discussed, to establish a discrimination claim, Mr.
Lilly must allege that he was subject to an adverse action based
on his gender and/or sexual orientation. *See Carter-Frost*, 305
F. Supp. 3d at 67; *Brady*, 520 F.3d at 493. Similarly, to prove
retaliation, Mr. Lilly must show that he engaged in a protected
activity and that he suffered a materially adverse action by MPD
as a causal result of having engaged in that activity. *See
Carter-Frost*, 305 F. Supp. 3d at 73; *Dieng*, 412 F. Supp. 3d at
8. "The D.C. Circuit, however, has instructed that when
considering a motion for summary judgment in an employment
discrimination [or retaliation] case, a distinct court need not
consider whether a plaintiff has actually satisfied the elements
of a prima facie case if the defendant has offered a legitimate,
non-discriminatory reason for its actions." *Musgrove*, 775 F.
Supp. 2d at 169 (citing *Brady*, 520 F.3d at 494).

A legitimate, non-discriminatory reason is a "clear and
reasonably specific" explanation for the employer's actions,
*i.e.*, "simply explain[ing] what [it] has done or produc[ing]
evidence of [those] legitimate nondiscriminatory reasons."
*Burdine*, 450 U.S. at 256-58 (internal quotation marks omitted).
"[I]n all instances where a defendant has asserted a legitimate,

non-discriminatory reason for its conduct, the Court shall evaluate all of the evidence in the record" when assessing the legitimacy of that reason. *Washington v. Chao*, 577 F. Supp. 2d 27, 39 (D.D.C. 2008). Under the Court's evaluation of an discrimination claim on summary judgment, the "inquiry collapses into a single question: '[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?'" *Id.* (quoting *Brady*, 520 F.3d at 494). Likewise, under the Court's assessment of a retaliation claim on summary judgment, the "central question" reduces to whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted . . . non-retaliatory reason was not the actual reason [for its adverse action] and that the employer intentionally . . . retaliated against the employee." *Walker*, 798 F.3d at 1092. Upon the articulation of a legitimate reason for the alleged discriminatory or retaliatory adverse action, the burden shifts back to the plaintiff to rebut the defendant's stated reason as pretextual. *See Musgrove*, 775 F. Supp. 2d at 170. The plaintiff can "carry this burden by showing that a non-discriminatory reason offered by [the] defendant is false," *id.* (citing *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C.

Cir. 2008)); or by "presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence[,]" *id.* (quoting *Desmond*, 530 F.3d at 962).

Here, the parties disagree as to whether the District has stated legitimate, non-discriminatory reasons for five of its actions: (1) Mr. Lilly's disability retirement; (2) Mr. Lilly's five-day suspension following his receipt of several AWOL citations; (3) IAB's investigation into Mr. Lilly's encounter with U.S. Park Police and his subsequent citation for corrective action in the form of an official reprimand; (4) IAB's investigation into MPD's receipt of an anonymous complaint regarding Mr. Lilly's conduct as an officer; and (5) IAB's investigation into whether Mr. Lilly provided false information in his MPD recruitment package.[18] *Compare* Def.'s Mot., ECF No. 45 at 18-22, *and* Def.'s Reply, ECF No. 54 at 12-15, *with* Pl.'s Opp'n, ECF No. 48-1 at 30-39. For the reasons discussed below, the Court concludes that, for all five actions, a reasonable jury could find that the District has satisfied its burden to

---

[18] The District proffered a reason for Mr. Lilly's receipt of a fine following his retirement—that he did not serve a fifteen-day suspension prior to retiring. *See* Def.'s Mot., ECF No. 45 at 22 (citing Def.'s Ex. V, ECF No. 45-3 at 269). Mr. Lilly replies that he did not "cite[] this fine as evidence of the District's discriminatory conduct." Pl.'s Opp'n, ECF No. 48-1 at 39. The Court therefore does not consider this fine in its analysis.

articulate legitimate, non-discriminatory reasons that Mr. Lilly has not shown are pretextual. Because the District has "done everything that would be required of [it,]" it is entitled to summary judgment as to Mr. Lilly's remaining discrimination and retaliation claims. *Brady*, 520 F.3d at 494.

### 1. Mr. Lilly's Disability Retirement

The District argues that it had a legitimate, non-discriminatory reason for Mr. Lilly's disability retirement, specifically that his retirement was ordered by the PFRRB for the reasons set forth in the PFC's April 19, 2013 report. *See* Def.'s Mot., ECF No. 45 at 18; Def.'s Ex. D, ECF No. 45-3 at 69. That report noted that Mr. Lilly was on limited duty status since September 2012 "following deterioration in his work performance and emotional stability after an exposure to bedbugs." Def.'s Ex. D, ECF No. 45-3 at 74. The report reviewed Mr. Lilly's medical and mental health records to conclude that he "continue[d] to struggle with symptoms of a mood disorder, specifically depression and anxiety with obsessive features to a degree that [could] adversely impact his ability to perform the requirements of the job." *Id.* at 69, 74. The report also concluded that Mr. Lilly presented "with symptoms of depression, anxiety, and behavioral disinhibition which disable[d] his insight and capacity to function as a police officer[,]" and it recommended retirement pursuant to D.C. Code §§ 5-633, 5-634,

and 5-710. *Id.* at 74-75. That the report made these findings is an undisputed fact. *See* Def.'s SOF Reply, ECF No. 54-1 at 5 ¶¶ 29-31. The District states that in August 2013, the PFRRB ordered Mr. Lilly's retirement after determining that he "was incapacitated from further duty by reason of a disability incurred in the performance of duty[.]" *See* Def.'s Mot., ECF No. 45 at 19; Def.'s Ex. W, ECF No. 45-3 at 271; Def.'s Ex. X, ECF No. 45-3 at 275; Def.'s SOF Reply, ECF No. 54-1 at 6 ¶¶ 38-39.

Having asserted a legitimate, non-discriminatory, and non-retaliatory reason for his disability retirement, the burden shifts back to Mr. Lilly to demonstrate that the District's "stated reasons were pretextual, and the real reasons were prohibited discrimination [on the basis of his gender or sexual orientation] or retaliation[.]" *Walker*, 798 F.3d at 1092.  In an attempt to meet his burden, MR. Lilly argues that: (1) the District's "face value reliance" on the PFC's report is "unwise" because that report relied primarily on "a six-month old duty evaluation and a six-page [psychiatric] questionnaire" that led to "a lack of quality in the District's investigation[,]" and (2) that he "was able and willing to work in any less-than-full-duty capacity within [MPD], [and] he should have never been processed for involuntary retirement under D.C. Code [ ] § 5-710" per other sections of the D.C. Code, specifically §§ 5-633(h)(3)(A)-(B) and 5-634. Pl.'s Opp'n, ECF No. 48-1 at 30-32.

Even drawing all inferences in Mr. Lilly's favor, the Court
is not persuaded that this evidence could convince a reasonable
jury to conclude that the District's stated reasons for his
retirement were false and instead based on intentional gender
and/or sexual orientation discrimination. Even if the PFC report
relied heavily on "unfair" sources, *see* Pl.'s Opp'n, ECF No. 48-
1 at 30-31; Mr. Lilly points to "no evidence in [the] record
that Dr. Morote took [his] sexual orientation [or gender] into
account when she made her recommendation" that Mr. Lilly's
mental health diagnoses adversely impacted his ability to
function as an MPD officer, *see* Def.'s Reply, ECF No. 54 at 12.
Nor is there any evidence that the PFRRB considered Mr. Lilly's
gender or sexual orientation before ordering his retirement.
Instead, following the issuance of the PFC's report, the PFRRB
held a hearing on July 18, 2013 to review the evidentiary
material and hear testimony from Mr. Lilly and Dr. Morote before
reaching a reasoned conclusion as to his disability retirement.
*See* Pl.'s Ex. A, ECF No. 48-3 at 12; Def.'s Ex. BB, ECF No. 45-3
at 291-93. Mr. Lilly has also not otherwise presented "evidence
substantiated by the record[,]" *Burton v. Dist. of Columbia*, 153
F. Supp. 3d 13, 67 (D.D.C. 2015); that the District treated
similarly situated heterosexual officers more favorably than him
in the same factual circumstances, *see Carter-Frost*, 305 F.
Supp. 3d at 72 (quoting *Brady*, 520 F.3d at 495); or that the

District has a pattern of treating poorly officers in the same protected group as him, *see Walker*, 798 F.3d at 1092 (citing *Brady*, 520 F.3d at 495 n.3).[19] Nor does he establish that the District deviated "from established procedures or criteria," *id.*; since the D.C. Code sections that Mr. Lilly cites are inapposite, as they pertain to MPD officers "who sustained, in the performance of duty, any serious or life-threatening injury or illness for which [they] require[d] critical care treatment in a hospital intensive care unit or its equivalent," which is not applicable to Mr. Lilly, *see* D.C. Code § 5-633(h)(1)-(3).

Neither is the Court persuaded that Mr. Lilly's evidence could convince a reasonable jury to conclude that the District's stated reason for his retirement was based on retaliation. Temporal proximity between an employee's protected activity and an employer's adverse action "is a common and often probative form of evidence of retaliation." *Walker*, 798 F.3d at 1092 (citing *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009)). Yet, Mr. Lilly does not direct the Court's attention to any record evidence indicating that the PFRRB's decision followed

---

[19] Mr. Lilly attempted to make "similarly situated" comparisons between himself and fellow officers in his Amended Complaint. *See* Am. Compl., ECF No. 9 at 8 ¶¶ 39-40, 10 ¶ 48, 16 ¶ 78. Yet, he never goes "beyond the pleadings" to support these claims with "evidence substantiated by the record." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548 (1986); *Burton v. Dist. of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015).

any protected activity closely in time. And even if he had, at the summary judgment stage, "positive evidence beyond mere proximity is required to defeat" the District's stated reason for his retirement. *See Kurtiev v. Shell*, No. 15-cv-1839, 2020 WL 2838523, at *11 (D.D.C. June 1, 2020) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)).

For these reasons, the Court concludes that Mr. Lilly has failed to provide evidence from which "a reasonable jury could not only disbelieve the [District's] reasons, but conclude that the real reason" for his disability retirement "was a prohibited one." *Walker*, 798 F.3d at 1093.

### 2. Mr. Lilly's Five-Day Suspension Following Several AWOL Citations

The District also argues that it had legitimate, non-discriminatory reasons for citing Mr. Lilly for being AWOL on January 26, 2013; January 30, 2013; and April 18, 2013 because "he was, in fact, absent without leave." Def.'s Mot., ECF No. 45 at 19. The record supports it being undisputed that Mr. Lilly was AWOL on those three dates. *See* Def.'s Ex. J, ECF No. 45-3 at 190-91 (citing Mr. Lilly for being AWOL for eight hours on January 26, 2013 when he took prescription medication and overslept, causing him to not report for work that day); Def.'s Ex. K, ECF No. 45-3 at 197, 200-03 (citing Mr. Lilly for being AWOL for five hours and fifteen minutes on January 30, 2013 when

he admittedly overslept and for making false statements to his superior officers about it); Def.'s Ex. O, ECF No. 45-3 at 241-43 (citing Mr. Lilly for being AWOL for five and a half hours on April 18, 2013 and for making false statements to his superior officers about it); *see also* Def.'s SOF Reply, ECF No. 54-1 at 3 ¶¶ 14-17, 4 ¶ 24. Because of these AWOL incidents, the District states that it had legitimate, non-discriminatory reasons for disciplining Mr. Lilly and on May 15, 2013, imposing a five-day suspension, to be held in abeyance for one year. *See* Def.'s Mot., ECF No. 45 at 19; Def.'s Ex. S, ECF No. 45-3 at 252-55 (attaching a copy of the "Commander's Resolution Conference Worksheet," which calculated Mr. Lilly's suspension to be five days, "with all [five] held in abeyance for [twelve] months").

The Court concludes that the District has articulated legitimate, non-discriminatory reasons for Mr. Lilly's AWOL citations and five-day suspension, specifically that he was AWOL on the relevant dates. While Mr. Lilly does not dispute "the fact that he was charged with being AWOL," he attempts to establish pretext for the District's actions by "disput[ing] the motive and circumstances behind" MPD's formal investigations into his three 2013 AWOL incidents. *See* Pl.'s Opp'n, ECF No. 48-1 at 33-34. To do so, Mr. Lilly proffers three Notifications of Tardiness and one AWOL notice from 2011 to 2012 and argues that "none of these instances triggered an investigation to the

magnitude seen from January 2013 through Ma[]y 2013." *Id.* at 33;
*see also* Pl.'s Ex. L, ECF No. 48-3 at 285 (placing Mr. Lilly in
LWOP status for one hour due to his tardiness on February 11,
2011); Pl.'s Ex. M, ECF No. 48-3 at 287 (placing Mr. Lilly in
LWOP status for two hours due to his tardiness on September 29,
2012); Pl.'s Ex. N, ECF No. 48-3 at 289 (placing Mr. Lilly in
LWOP status for two hours due to his tardiness on November 3,
2012); Pl.'s Ex. O, ECF No. 48-3 at 291 (placing Mr. Lilly in
AWOL status due to his six-hour absence on November 20, 2012).
Mr. Lilly contends that after filing his complaint with Sergeant
Carlos Mejia and MPD's EEO Compliance Branch on January 13,
2013, *see* Def.'s Ex. H, ECF No. 45-3 at 122-24; Def.'s Ex. I,
ECF No. 45-3 at 126-85 (attaching the EEO Compliance Branch's
final report as to Mr. Lilly's allegations); he was retaliated
against with "increased scrutiny" and formal investigations into
each of his 2013 AWOL incidents, *see* Pl.'s Opp'n, ECF No. 48-1
at 33-34. Mr. Lilly claims that "[t]he dichotomy between the
dissected investigations of [him] from January 2013 through May
2013 and the laissez-faire one-page notices received by [him]
from February 2011 through November 2012" indicate pretext. *Id.*
at 34.

The Court concludes that Mr. Lilly has not "put forward
enough evidence to defeat the proffer and support a finding of
retaliation" for filing a complaint with MPD's EEO Compliance

Branch in relation to his AWOL citations and five-day
suspension, *Woodruff*, 482 F.3d at 530; as "imposing disciplinary
measures [is] legitimate[ly] [ ] warranted after a policy
infraction[,]" *see Carter-Frost*, 305 F. Supp. 3d at 71-74
(rejecting the plaintiff's pretext argument and finding that her
"involuntary detail to the Fifth District" as a result of
violating MPD policy, or "'corrective action' for her
infraction," was a legitimate, non-discriminatory action);
*Baloch*, 550 F.3d at 1200 (finding it legitimate that an employer
took adverse action because the "disciplinary measures . . .
occurred only after various infractions" and therefore, "[g]ood
institutional administration" justified discipline). Indeed, Mr.
Lilly "*concedes* the infractions that formed the basis for" MPD's
responses, *Baloch*, 550 F.3d at 1200; and admitted to being tardy
and AWOL in all the above incidents (three notices of tardiness
and four citations for being AWOL, totaling seven disciplinary
incidents between 2011 and 2013), *see* Pl.'s Opp'n, ECF No. 48-1
at 33; Def.'s SOF Reply, ECF No. 54-1 at 3 ¶¶ 14-17, 4 ¶ 24, 7
¶¶ 41-44. As such, the Court concludes that Mr. Lilly has not
produced evidence, apart from "unsupported conjecture," Def.'s
Reply. ECF No. 54 at 13; to prove that the District's asserted
reasons for its challenged disciplinary actions "were so ill-
justified as to allow a jury to conclude that they were not the

actual reasons and that he suffered retaliation for his discrimination complaints[,]" *Baloch*, 550 F.3d at 1200.

### 3. IAB's Three Internal Affairs Investigations into Mr. Lilly's Conduct

Finally, the District argues that it had legitimate, non-discriminatory reasons for conducting "investigations into allegations of misconduct against [Mr. Lilly] during the months leading up to his retirement." Def.'s Mot., ECF No. 45 at 19-20. The District proffers explanations for three investigations, alleging that "each investigation was based on a legitimate inquiry into whether [Mr. Lilly] violated MPD policies." *Id.* at 20-22. Mr. Lilly counters that the District's reasons "are littered with inconsistencies, contradictions, and deviation[s] from policy." Pl.'s Opp'n, ECF No. 48-1 at 29. These three IAB investigations are addressed in turn below.

### a. IAB's Investigation into Mr. Lilly's Encounter with U.S. Park Police and His Subsequent Citation for Corrective Action in the Form of an Official Reprimand

First, the District states that IAB opened an investigation into whether Mr. Lilly committed misconduct during an encounter with two U.S. Park Police officers after one of those officers reported the incident to MPD. *See* Def.'s Mot., ECF No. 45 at 20; Def.'s Ex. M, ECF No. 45-3 at 209, 215. The undisputed facts and record evidence indicate that on April 11, 2013, the U.S. Park Police contacted MPD after they encountered Mr. Lilly walking

near a ravine on the shoulder of the George Washington Memorial Parkway. *See* Def.'s Ex. M, ECF No. 45-3 at 209, 214-15; Def.'s SOF Reply, ECF No. 54-1 at 3-4 ¶ 19. When questioned by the officers, Mr. Lilly identified himself as an MPD officer and displayed a duplicate copy of his MPD badge, despite his police powers having been previously revoked in September 2012. *See* Def.'s Ex. F, ECF No. 45-3 at 90; Def.'s Ex. M, ECF No. 45-3 at 215; Def.'s SOF Reply, ECF No. 54-1 at 4 ¶ 20. Following the encounter, the U.S. Park Police sent MPD 4D a copy of the incident report. *See* Def.'s Ex. M, ECF No. 45-3 at 215. Afterwards, IAB opened an investigation and issued its final investigative report on May 22, 2013, recommending that Mr. Lilly be cited for corrective action in the form of an official reprimand "for violating General Order 120.21, Attachment A, Part A, 25," which governs "[a]ny conduct not specifically set forth in this order, which is prejudicial to the reputation and good order of the police force[.]" *Id.* at 209, 215. IAD concluded that by displaying his spare MPD badge while his police powers were revoked, Mr. Lilly had engaged in conduct that was "prejudicial to the reputation and good order of the police force" and "detrimental" to MPD. *Id.* at 215.

In discussing the District's reason for this investigation, the parties focus on facts that paint a different picture of Mr. Lilly's behavior on the date in question. *Compare* Def.'s Mot.,

ECF No. 45 at 20 (noting that Mr. Lilly was "wearing unusual attire including a belt of fake ammunition" and "was talking in circles"), *with* Pl.'s Opp'n, ECF No. 48-1 at 35 (describing Mr. Lilly's demeanor on the scene as "polite, cooperative, professional and not rude or demanding"). Regardless of how the facts are characterized, the Court concludes that the District has stated a legitimate, non-discriminatory reason for this investigation. The undisputed facts indicate that the U.S. Park Police, an independent federal agency, contacted MPD during the incident to verify Mr. Lilly's identity as an MPD officer after he displayed his spare badge to the officers, and that following this encounter, the U.S. Park Police shared its incident report with MPD 4D. *See* Def.'s SOF Reply, ECF No. 54-1 at 3-4 ¶ 19; Def.'s Ex. M, ECF No. 45-3 at 215. After being informed of this off-duty incident, the District initiated its investigation, and while Mr. Lilly claims that the "true reason" for the investigation "was because [he] looked too 'gay' to be an office[r,]" Pl.'s Opp'n, ECF No. 48-1 at 36; "there is no basis in the record to believe that the investigation was unfounded or initiated for pretextual reasons[,]" *Carter-Frost*, 305 F. Supp. 3d at 71. Mr. Lilly attempts to establish pretext by claiming that the Park Police officers' reports and statements focused on his appearance and that he was dressed in a manner "not normally associate[d] with a police officer," based on his clothing,

58

makeup, and nail attire. *See* Pl.'s Opp'n, ECF No. 48-1 at 34-35. However, none of these details establish that IAB, or even the Park Police, investigated Mr. Lilly because of his gender or sexual orientation. *See id.* at 35 (admitting that "[n]othing in the witness statements indicate[s] why [the Park Police] reported [him] to the 4th District"). Nor does Mr. Lilly adduce evidence that other heterosexual MPD officers who were involved in off-duty incidents were treated more favorably and not similarly investigated. *See Carter-Frost*, 305 F. Supp. 3d at 71-72; *Walker*, 798 F.3d at 1092 (citing an "employer's better treatment of similarly situated employees outside the plaintiff's protected group" as a way to establish pretext).

Moreover, the undisputed facts indicate that Mr. Lilly admitted to displaying his spare MPD badge while his police powers were revoked. Def.'s SOF Reply, ECF No. 54-1 at 4 ¶ 20; Def.'s Ex. M, ECF No. 45-3 at 215. Although not conduct "specifically outlined in [MPD's] orders or directives," MPD maintains a General Order prohibiting prejudicial conduct to the police force, and IAB concluded that Mr. Lilly violated this General Order with his "detrimental" conduct and cited him with an official reprimand as a result. *See* Def.'s Ex. M, ECF No. 45-3 at 215. Assuming this was an adverse action, the Court has already noted that imposing disciplinary measures is a legitimate course of action following misconduct that violates

an employer's policies. *See Carter-Frost*, 305 F. Supp. 3d at 71.
Furthermore, to the extent Mr. Lilly attempts to demonstrate
discrimination and/or retaliation based on temporal proximity
between this IAB investigation and "the middle of" MPD's EEO
Compliance Branch investigation, the Court rejects that
argument, as it was Mr. Lilly himself who initiated the incident
with the Park Police on April 11, 2013. *See* Pl.'s Opp'n, ECF No.
48-1 at 35-36. Therefore, having received no competent evidence
that the District's stated explanation is unworthy of credence,
the Court concludes that Mr. Lilly has failed to carry his
burden of persuasion on this issue. *See Musgrove*, 775 F. Supp.
2d at 171.

> b. **IAB's Investigation into MPD's Receipt of an
> Anonymous Complaint Regarding Mr. Lilly's
> Conduct as an Officer**

The District next states that IAB opened an investigation
into Mr. Lilly's conduct as an officer because on January 7,
2013, it received an anonymous complaint that he had "conducted
himself in a manner that was unbecoming" of an MPD officer. *See*
Def.'s Mot., ECF No. 45 at 21; Def.'s Ex. N, ECF No. 45-3 at
225. The complaint alleged that Mr. Lilly had posted
inappropriate YouTube videos and that he was mentally ill. *See*
Def.'s Ex. N, ECF No. 45-3 at 225. On January 13, 2013, the case
was assigned to an IAD detective, who began the investigation.
*Id.* at 226. The investigation concluded with IAB's April 17,

2013 final investigative report, in which IAB found that Mr.
Lilly had exercised his First Amendment rights in the YouTube
videos and therefore recommended closing the investigation due
to "insufficient facts." *Id.* at 234. IAB thereafter forwarded
the anonymous allegation regarding Mr. Lilly's mental status to
MPD's PFC for review because it was not equipped to assess his
mental condition. *Id.* at 235. Having received a complaint from a
third-party regarding Mr. Lilly's conduct as an MPD officer, the
District has proffered legitimate, non-discriminatory reasons
for opening this investigation, and the burden shifts back to
Mr. Lilly to demonstrate that these stated reasons were
pretextual, "and the real reasons were prohibited discrimination
or retaliation[.]" *Walker*, 798 F.3d at 1092.

       To meet this burden, Mr. Lilly argues that discrimination
and retaliation are proven based on the way IAB conducted its
investigation, which he claims was contrary to the procedure
outlined in MPD's General Order for Processing Citizen
Complaints. *See* Pl.'s Opp'n, ECF No. 48-1 at 36-38; Pl.'s Ex. J,
ECF No. 48-3 at 239-58. Yet, the record evidence indicates that
MPD's policy "is to accept all citizen complaints, to include
anonymous complaints[.]" Pl.'s Ex. J, ECF No. 48-3 at 240. That
IAB's investigation may have deviated slightly from the outlined
procedure (*i.e.*, as Mr. Lilly claims, taking more than three
business days to contact the complainant), *see id.* at 246; Pl.'s

Opp'n, ECF No. 48-1 at 37; does not give rise to any inference of discrimination or retaliation, either in the initiation of the investigation or in the way it was conducted, *see Baloch*, 550 F.3d at 1201. Neither does Mr. Lilly benefit from a temporal proximity argument, as MPD received the anonymous complaint *before* he reported the locker incident to Sergeant Carlos Mejia on January 13, 2013. *See* Def.'s Ex. N, ECF No. 45-3 at 225; Def.'s Ex. H, ECF No. 45-3 at 122. And, the IAB investigation cleared Mr. Lilly of misconduct *following* his reporting of the locker incident, thus negating any inference of discrimination or retaliation. *See* Def.'s Ex. N, ECF No. 45-3 at 234.

Regardless, the Court does not conclude that this investigation resulted in any adverse action against Mr. Lilly. Generally, "the 'mere initiation' of an investigation may not constitute a materially adverse action[.]" *King v. Holder*, 77 F. Supp. 3d 146, 151 (D.D.C. 2015) (citing *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004)). And an investigation is not usually considered adverse unless it results in "materially adverse consequences affecting the terms, conditions, or privileges of" a plaintiff's employment or future employment opportunities. *Id.* at 151-52 (citation omitted). Here, no such adverse consequences emerged, as Mr. Lilly admits he was not disciplined following the conclusion of IAB's investigation. Pl.'s Opp'n, ECF No. 48-1 at 36. Without the requisite adverse

action, no reasonable jury could conclude that Mr. Lilly established discrimination or retaliation under Title VII or the DCHRA for this claim.

### c. IAB's Investigation into Whether Mr. Lilly Provided False Information in His MPD Recruitment Package

Finally, the District states that IAB conducted an investigation from June 19, 2013 to August 8, 2013 to determine whether Mr. Lilly "provided false information in his drug use and medical history statement for his recruitment package." Def.'s Mot., ECF No. 45 at 21. The District states that IAB opened this investigation following MPD PFC's receipt of a letter from Dr. Walker Lyerly, Mr. Lilly's personal psychiatrist for the past sixteen years, containing information regarding his medical status that conflicted with his recruitment package. *Id.* at 21-22. On August 8, 2013, IAB issued its final investigative report, concluding that Mr. Lilly intentionally lied during the recruitment process regarding his medical and mental health history. *See* Def.'s Ex. T, ECF No. 45-3 at 258-62.

The District has provided legitimate, non-discriminatory reasons for conducting this third IAB investigation into Mr. Lilly's conduct, and the Court does not conclude that the evidence is such to make a reasonable jury disbelieve these reasons or conclude that the real reasons for the investigation were discrimination or retaliation. *See Walker*, 798 F.3d at

1092-93. Mr. Lilly claims that the District used this
investigation to "cover up [its] true, longstanding motivations
for penalizing" him but does not cite anything from the record
to support this statement. *See* Pl.'s Opp'n, ECF No. 48-1 at 39.
While this investigation concluded the day before the PFRRB
issued Mr. Lilly's interim retirement order, it began because of
information received from a third-party and occurred long after
Mr. Lilly's three instances of internal reporting (October 29,
2012; January 13, 2013; and April 18, 2013), thereby negating
inferences of retaliation or discrimination. Thus, even drawing
all inferences in Mr. Lilly's favor and assuming as true the
PFC's awareness of Mr. Lilly's treatment by Dr. Lyerly from the
age of thirteen, a reasonable jury would not believe that IAB—a
separate MPD entity from the PFC—had any legitimate reason to
open an investigation or access Mr. Lilly's PFC medical records
until receipt of Dr. Lyerly's letter. As such, the Court
concludes that Mr. Lilly has failed to provide enough evidence
to rebut the District's stated reasons for this IAB
investigation.

## V.   Conclusion

Drawing every justifiable inference in Mr. Lilly's favor,
as the Court must, it finds no basis under Title VII or the
DCHRA upon which a reasonable factfinder could conclude that the
District had discriminatory intent based on his gender and/or

sexual orientation, or was retaliating against him for taking part in a protected activity. Accordingly, the District's Motion for Summary Judgment, ECF No. 45, is **GRANTED.** An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

       **Signed:**    **Emmet G. Sullivan**
                 **United States District Judge**
                 **February 21, 2023**